Magdalene CAMPBELL, Appellant,

v.

C.D. PAYNE AND GELDERMANN SECURITIES, INC., Appellees.

No. 07–93–0412–CV.

Court of Appeals of Texas, Amarillo.

Jan. 31, 1995.

Rehearing Overruled March 8, 1995.

Rehearing Overruled April 3, 1995.

John S. Dwyre, San Antonio, Hamker & Walton, Ed Walton, Jeffrey W. Shell, Amarillo, for appellant.

William L. Rivers, Amarillo, Quilling, Selander, Cummiskey, Clutts & Lownds, Steven J. Lownds, James Craig Orr, Jr., Dallas, for appellees.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.*

BOYD, Justice.

This appeal arises from a suit filed by appellant Magdalene Campbell (Campbell) against appellees C.D. Payne (C.D.), Stephen Bryan Payne (Stephen), and Geldermann Securities (Geldermann) f/k/a Heinhold Securities. In her suit, Campbell sought recovery for various alleged negligent misrepresentations, violations of the Texas Securities Act,[1] breach of the duty of good faith and fair dealing, breach of fiduciary duty, promissory estoppel, negligent entrustment, negligent retention and/or negligent supervision, fraud, agency, civil conspiracy and violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA).[2] The claims against Stephen, as well as a third party action C.D. brought against Fred Payne, were severed from this cause. From a judgment decreeing she take nothing against Geldermann but recover a total of $34,000 (including actual damages, mental anguish damages and punitive damages) from C.D., Campbell brings this appeal. For reasons hereinafter discussed, the judgment of the trial court is affirmed in part and reversed and remanded in part.

A proper discussion of this appeal requires that we first give a brief overview of the extensive testimony in the case. C.D., who prior to her marriage to Fred Payne had also been known as C.D. Pointer and C.D. Salas, began her career in the brokerage industry

---

* Poff, J., whose term has expired, not participating.

**1.** See Tex.Rev.Civ.Stat. arts. 581–1 to –41 (Vernon 1964 & Supp.1994).

**2.** See Tex.Bus. & Comm.Code Ann. §§ 17.41–.63 (Vernon 1987 & Supp.1994).

with the firm of Kidder Peabody in Amarillo, Texas. After approximately one year, she resigned from that firm and moved to Arkansas, where she was employed by Dean Witter Reynolds. After about one year there, she returned to Amarillo and again went to work for Kidder Peabody. Upon her return to Kidder Peabody, C.D. was given a one-day suspension for selling some stock, while she was employed in Arkansas, which was not registered in that state. After she had been with Kidder Peabody for approximately four years, C.D. sold some stock in a company called America Shopping Channel. The stock, however, was a private placement not authorized by her employer and, as a result of that sale, her employment with Kidder Peabody was terminated.

After her return to Amarillo, and while employed by Kidder Peabody, C.D. met Campbell. The facts concerning the beginning of their relationship are disputed. C.D. testified she met Campbell at an investment course she taught in Amarillo; however, Campbell claims they met through a friend of Campbell's. In the course of that relationship, according to C.D, they purchased money market funds, stocks traded on the New York Stock Exchange, over-the-counter stocks, options, and tax exempt bonds.

Subsequently, C.D. applied for employment with Heinhold Securities, the progenitor of Geldermann. After a trip to Heinhold's Chicago offices to explain why her employment with Kidder Peabody was terminated, C.D. was hired by that company, where she continued to be employed until sometime in 1987. Although she had never heard of Heinhold Securities prior to C.D.'s employment with the firm, Campbell transferred her account to Heinhold.

In 1984, C.D. became acquainted with Fred Payne, whom she subsequently married in January 1985. At that time, Fred was a partner with his brother, Stephen, in a company called Electrical Specialists, which was ultimately incorporated under the name of Enertech Systems, Inc. The company installed computerized components that controlled heating and cooling in public schools and in Furrs grocery stores. Furrs gave the company a contract covering 150 stores.

According to C.D., the profit potential for each grocery store was between five and seven thousand dollars. She was excited about that potential and communicated that excitement to Campbell. C.D. testified, although denied by Campbell, that Campbell expressed interest in loaning the company some money. It was Campbell's position that C.D. represented to her that putting money in Enertech was the best investment she could make to get a fixed income.

There was testimony that Campbell had made a number of personal loans to an Amarillo real estate investor named Tom Dawkins, such loans bearing an interest rate of 11% per annum. It was C.D.'s testimony, again contested, that none of Campbell's other investments had produced that rate of return and that Campbell was interested in making similar loans to Enertech.

The discussions between C.D. and Campbell culminated in a series of advancements totaling $133,500 made by six checks from Campbell made payable to C.D. (under her former name of C.D. Pointer) and to Enertech. The first two of these checks, totaling $85,000, were payable to C.D. Pointer and were deposited by her in her personal account. Of this $85,000, C.D. stated that she delivered $15,000 to Enertech. In exchange for these checks, on July 1, 1985, C.D. executed a written instrument denominated as a "promissory note" in the principal amount of $85,000, payable to Campbell, bearing interest at 11% per annum, and due on July 1, 1987. At that time, the instrument read that it would "either be paid off in full or rolled over yearly, both interest and principal upon a set number of years agreed upon by both parties." The remainder of the checks were made payable to Enertech and, in exchange, the corporation made four notes payable to Campbell, the face amounts of which totaled $48,500.

On July 1, 1986, C.D. and Fred executed another written instrument, also denominated as a "promissory note," in the original principal amount of $79,350, payable to Campbell, bearing interest at the rate of 11% per annum and due July 1, 1987. This note was in renewal and extension of the balance

due on the $85,000 note, less the $15,000 C.D. had deposited directly to Enertech, plus $9,350 interest. On July 25, 1986, Enertech executed a note in the principal sum of $64,000 payable to Campbell, due on or before July 26, 1987, in renewal and extension of the $15,000 C.D. had delivered to Enertech as well as the four notes executed by Enertech in face amounts totaling $48,500 that are mentioned above.

Subsequently, Furrs terminated its contract with Enertech which ultimately led to that corporation's dissolution. According to C.D., when Furrs terminated its contract with Enertech, she had two notes drawn, each in the amount of $32,000, dated August 13, 1986, and due on August 13, 1987, one of which was for execution by Stephen and the other by Fred. The two notes each represented one-half of the $64,000 corporate note assumed by the Payne brothers. Additional references to those advances, and/or the notes and renewal notes as well as other evidence, will be made as necessary to a discussion of Campbell's points of error.

In response to the questions submitted to it, the jury found: (1) C.D. made one or more negligent representations to Campbell; (2) a fiduciary relationship existed between C.D. and Campbell; (3) C.D. breached her fiduciary duty to Campbell which was a proximate cause of damages to Campbell; (4) C.D. made representations to Campbell which were material and false with the intention that Campbell act upon those representations, which she did, and which proximately caused Campbell damages; (5) C.D. made the representations either recklessly or with knowledge that they were false; and (6) that $30,000 should be assessed against C.D. as exemplary or punitive damages.

In response to the corresponding questions, the jury also (7) refused to find Geldermann's conduct was a producing cause of damages to Campbell; and (8) found that C.D.'s conduct was a producing cause of damages to Campbell. The jury also found (10) the transaction in question involved the sale or offer for sale of a security; (11) that C.D. sold or offered to sell a security by means of an untrue statement or an omission to state a material fact; and (12) Geldermann

directly or indirectly controlled C.D. in the sale or offer for sale of securities.

In the following enumerated questions, the jury found that (13) it was reasonably foreseeable by C.D. that Campbell would rely to her detriment on C.D.'s promises and that reliance was a proximate cause of damages to Campbell; and (14) by July 17, 1987, through the exercise of reasonable diligence, Campbell should have discovered the nature of her injury. The jury also found (15) Campbell had incurred $3,000 out-of-pocket expenses; and (16) that Campbell was entitled to $1,000 as damages for her mental anguish.

The jury also made the following findings in response to submitted questions: (18) that Geldermann was negligent in its hiring or supervision of C.D.; and (19) that such negligence proximately caused Campbell $50,000 in damages. From the copy of the charge in the record, it does not appear that any questions numbered 20 and 21 were submitted. The jury then (22) refused to find Campbell suffered mental anguish as a result of Geldermann's conduct; and (23) did not answer the inquiry as to the amount necessary to compensate Campbell for any such mental anguish.

The jury also (24) refused to find that Geldermann's conduct was the result of a conscious indifference to the rights of its customers, including Campbell, which obviated the necessity for an answer as to (25) whether such acts or omissions were committed by managerial employees; and (26) whether the managerial employees were acting within the scope of their employment at the time of such acts or omissions. The jury then opined (27) that C.D. was an unfit employee who was employed recklessly by Geldermann; and (28) that 25% of the damages Campbell incurred as a result of Geldermann's negligent hiring or supervision of C.D. were proximately caused by her own negligence. The jury (29) refused to find that C.D. was acting in the course and scope of her employment with Geldermann in connection with the transactions giving rise to the suit. Because the jury found that Geldermann's conduct was not a producing cause of damages to Campbell, in compliance with the instructions of the court, the jury

did not determine (30) whether Geldermann knowingly engaged in wrongful conduct; or (31) the amount of money that should be awarded Campbell as additional damages for such conduct. The jury also found (32) that C.D. had knowingly engaged in the wrongful conduct that was a producing cause of Campbell's damages; and (33) that Campbell should be awarded an additional $160,000 in damages. The jury then determined that (34) C.D.'s acts were intentional, or done with actual or implied malice toward Campbell; however, the jury refused to find Geldermann guilty of such conduct. As we have indicated above, judgment was rendered that Campbell take nothing against Geldermann, but that she recover $3,000 in actual damages, $1,000 in mental anguish damages, and $30,000 in exemplary damages from C.D.

In mounting her attack upon the trial court's judgment, Campbell raises eleven points of asserted error. We will discuss those points sequentially as they bear on the disposition of this appeal. In her first point, Campbell contends the trial court erred in overruling her motion for judgment against C.D. and Geldermann "based upon the jury's verdict on liability and the statutory relief for damages and rescission." Her argument under this point is based upon the jury's answers to questions 11 and 12 in which the jury found C.D. sold or offered for sale a security and that Geldermann "directly or indirectly" controlled her in that activity.

In large measure, Campbell's argument is premised on that portion of the Texas Securities Act which provides that a "control person" is liable "to the same extent as if he were the seller ... or issuer ...," Tex.Rev. Civ.Stat.Ann. art. 581–33(F)(1) (Vernon Supp.1995), and that portion which provides that a buyer, either through rescission or by damages "shall recover (a) the consideration he paid for the security plus interest thereon at the legal rate ... less (b) the amount of any income he received on the security...." *Id.* art. 581–33(D)(1).

Campbell contends that inasmuch as the amount of money she paid, *i.e.*, $133,500, and the amount she received, *i.e.*, $10,500, are not in dispute, "the Court must render judgment in the undisputed amount." She argues that liability is established when there is a sale of an unregistered security or when the security is sold through untruth or omission. She continues that as the parties stipulated the items involved in the transaction in question were not registered, the jury's finding of untruth or omission requires rendition of judgment in the amount of $274,847.05, such amount including accrued interest less the payment as well as attorney's fees. We disagree.

■ It is the rule that, because of the obvious similarities between the Texas Securities Act and the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas act. *Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637, 639 (Tex. 1977); *Star Supply Co. v. Jones*, 665 S.W.2d 194, 196 (Tex.App.—San Antonio 1984, no writ). For example, it has been held that the decisions of federal courts regarding the definition of "securities" under the federal act are a reliable guide to the definition of "securities" under the Texas act because the two acts contain virtually the same wording. *First Mun. Leasing Corp. v. Blankenship, Potts, Aikman, Hagin and Stewart*, 648 S.W.2d 410, 414 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); *Wilson v. Lee*, 601 S.W.2d 483, 485 (Tex.Civ.App.—Dallas 1980, no writ). *See also* 15 U.S.C.S. § 77b (The term "security" means any note....); Tex.Rev.Civ.Stat. Ann. § 581–4 (The term "security" or "securities" shall include any ... note....).

In *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), the United States Supreme Court was presented with the question of whether certain demand notes issued by an agricultural cooperative were "securities" within the meaning of the federal Securities Exchange Act. *Id.*, 494 U.S. at 58, 110 S.Ct. at 947–48. The Court treated the determination of that question as one of law to be made by the Court. *Id.* at 61, 110 S.Ct. at 949; *see also Ahrens v. American–Canadian Beaver Co.*, 428 F.2d 926, 928 (10th Cir.1970). Likewise, the determination of whether the documents with which we are concerned are "securities" within the purview of our Texas statute is

also a matter of law to be determined by the trial court.

In the *Reves* case, the Court adopted the "family resemblance" test for determining whether a promissory note is a "security" as defined under the security statutes. *Reves,* 494 U.S. at 65, 110 S.Ct. at 951. En route to its decision, the Court noted that although Congress enacted a broad definition of "security" in the statute, it did not "intend to provide a broad federal remedy for all fraud." *Id.* at 61, 110 S.Ct. at 949 (citing *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223–24, 71 L.Ed.2d 409 (1982)). Rather, the Court explained that Congress intended "to regulate *investments,* in whatever form they are made and by whatever name they are called." *Id.* (original emphasis). The Court then commented that the term "note" is now viewed "as a relatively broad term that encompasses instruments with widely varying characteristics," depending upon the context in which it was issued. *Id.* at 62, 110 S.Ct. at 949–50. Because of this, the Court explained, "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *Id.* at 63, 110 S.Ct. at 950.

In its decision, the Court enumerated certain type of notes that are not "securities," such as "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business...." *Id.* at 65, 110 S.Ct. at 951.

Considering these matters, the *Reves* Court concluded that in determining whether an instrument denominated as a "note" is a "security" within the scope of the federal Securities Exchange Act, a court should apply the "family resemblance" test. *Id.* at 67, 110 S.Ct. at 952. In applying that test, a court should bear in mind that every note is presumed to be a "security." This presumption may be rebutted, however, by a showing that the note bears a "strong resemblance," as measured by four factors the Court identified, to one of the categories of notes the Court enumerated as beyond the scope of the Act. The Court also observed that if an instrument was not sufficiently similar to an item on the enumerated list, "the decision whether another category should be added is to be made by examining the same factors." *Id.*

The first factor the Court suggested is the motivation for the transaction, commenting that if the seller/borrower's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer/lender is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." *Id.* at 66, 110 S.Ct. at 952. On the other hand, if the note was exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller/borrower's cash-flow difficulties, or to advance some other commercial or consumer purpose, "the note is less sensibly described as a 'security'."

The second factor is the plan of distribution of the instrument, *i.e.,* whether it is an instrument in which there is common trading for speculation or investment. The third factor is the reasonable expectations of the investing public. The fourth and final factor is whether there exists another regulatory scheme which significantly reduces the risk of the instrument. *Id.* at 67, 110 S.Ct. at 952.

We find the "family resemblance" test to be reasonable and applicable to the determination of whether the notes in question here were "securities" within the purview of the Texas Securities Act. Examination of the motives of the parties show that Campbell did not expect a "profit" in the sense of capital appreciation or participation in earnings; instead, she expected only a fixed return in the form of interest on the notes. This record demonstrates there was no plan for the notes that was intended to lead to their common trading for speculation or investment. The record also demonstrates that these notes were not of such a nature

that would lead the general public to consider them as securities.

In sum, the record shows that these notes represented a private transaction between Campbell and C.D and were of a nature closely related to those transactions the *Reves* Court noted were not intended to be included within the regulatory scheme of a securities act. Inasmuch as that decision was a legal question to be determined by a court, the trial court in this case was entitled to disregard the jury's finding that the transaction in question involved the "sale or offer for sale of a security." *Anheuser–Busch Companies, Inc. v. Summit Coffee Company*, 858 S.W.2d 928, 935 (Tex.App.—Dallas 1993, writ denied). Additionally, inasmuch as the notes in question were not "securities" within the scope of the Texas Securities Act, Geldermann could not be a "control person" as defined by the Act and the trial court was justified in disregarding the jury's finding that Geldermann "directly or indirectly controlled C.D. [ ] in the sale or offer for sale of securities." Campbell's first point is overruled.

In her second point, Campbell posits the trial court erred in overruling her motion for judgment because the evidence before the court conclusively established, as a matter of law, that she had incurred actual damages in the amount of $123,000.

In the trial court's charge, the jury was instructed that if it had affirmatively answered any of questions 1, 3, 5, 7, 8, 11, or 13, it was to determine the amount of out-of-pocket expenses Campbell incurred. As submitted, and with the jury's answer, the question read:

### Question No. 15

What sum of money, if any, if paid now in cash, would reasonably compensate Magdalene Campbell for her damages, if any, that resulted from such conduct?

Do not include any amount for interest on past damages, if any.

Consider the following elements of damage and none other.

a. Out of pocket expenses;

Answer in Dollars and Cents, if any.

Answer: $3,000.00

A motion to disregard a jury's findings may be granted only if the finding has no support in the evidence or if the issue is immaterial, *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966), and it is only when the evidence conclusively establishes an opposite finding that a judge may substitute his own finding for that of the jury. *Miranda v. Joe Myers Ford, Inc.*, 638 S.W.2d 36, 38 (Tex.App.—Houston [1st Dist.] 1982, no writ). An issue is conclusively established when the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. *Triton Oil and Gas Corp. v. Marine Contractors and Supply, Inc.*, 644 S.W.2d 443, 446 (Tex.1982). Where the proponent of a jury question has failed to obtain a favorable jury finding but contends that the matter, which was the subject of the question, was established as a matter of law, this court must, as with a no-evidence challenge, examine the entire record to determine if there is any evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, oppose that which is urged as inclusive. If there is some such evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, oppose that which is urged as conclusive, the inquiry stops because whatever the proponent's evidence, it cannot be conclusive if opposing evidence is in the record. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 440 (Tex.App.—Amarillo 1993, no writ).

Texas Courts have recognized two measures of damages for misrepresentation. The first measure is known as the "out of pocket" measure and allows an injured party to recover damages for the actual injury suffered, calculated by determining the difference between the value of that which he has parted with and the value of that which he has received, calculated as of the date of the sale or delivery. *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex.1984); *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 840 (Tex.App.—Amarillo 1993, writ denied); *Chrysler Corp.*

*v. McMorries,* 657 S.W.2d 858, 864 (Tex. App.—Amarillo 1983, no writ). The second measure is the "benefit of the bargain" measure, which is the difference between the value as represented and the value actually received. *Id.*

Damages must be measured by a legal standard and that standard must be used to guide the fact finder in determining what sum would properly compensate the injured party. While the form of submission of a particular question is left to the sound discretion of the trial court, it is essential that the submission be sufficient to enable the jury to make an award of damages on proper grounds and correct principles. In its instruction, the trial court should limit the jury's consideration to the specific facts that are properly a part of the damages allowable. However, when the trial court has erroneously failed to include instructions on the proper measure of damages, it is the complaining party's burden both to object to the charge and to tender such instructions in substantially correct form. *Texas Commerce Bank Reagan Through Texas Commerce Bank Nat. Ass'n v. Lebco Constructors, Inc.,* 865 S.W.2d 68, 75 (Tex.App.—Corpus Christi 1993, no writ).

It is obvious that this question asking for the amount of Campbell's damages required the jury to use the "out of pocket" measure in determining its answer. Campbell makes no complaint as to the form and manner of that submission. In support of her position that the evidence conclusively established the amount of her damages, Campbell assumes that the undisputed testimony that she advanced a total of $133,500, when taken with the undisputed testimony that C.D. paid her $1,500 and Stephen paid her $9,000, was sufficient to conclusively establish that she incurred damages in the amount of $123,000, the difference between the total amount she advanced and the amounts she received.

This argument, however, overlooks C.D.'s testimony that after she received a demand letter from Campbell's attorney, she and Stephen both made an offer for repayment of the obligation. The reasonable inference from that testimony is that the notes which

Campbell had received had some value in excess of the amount which had been paid on the notes. There is no evidence to the contrary. The evidence is not sufficient to establish, as a matter of law, that Campbell's out-of-pocket expenses amounted to $123,000 as she contends. Campbell's second point is overruled.

The gravamen of Campbell's third and fourth points is that the jury's finding that she incurred only $3,000 in out-of-pocket expenses is against the great weight and preponderance of the evidence and is manifestly unjust. That contention requires us to weigh all the evidence in the case to determine if the evidence supporting the finding is so weak or the finding so against the great weight and preponderance of the evidence as to be manifestly unjust. If we so determine, the finding should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *In re Kings Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). As we have noted above, in submitting Question 15 regarding damages, the trial court instructed the jury to consider only the "out of pocket" expenses Campbell incurred. By the use of that measure, the court intended for the jury to determine the difference between the value of that which was parted with and the value of that which was received. *Hedley Feedlot, Inc.,* 855 S.W.2d at 840.

The evidence revealed that Campbell parted with $133,500 and had received only $10,500, of which C.D. paid $1,000 and Stephen paid $9,000, a difference of $123,000. It is reasonable to infer, from the testimony that C.D. and Stephen intended to fully repay their promissory note obligations, that the notes had some value. However, there is absolutely no evidence that $3,000 was the difference between the value of that with which Campbell parted and the value of that which she received. While jurors are not bound, as a matter of law, to accept the parties' testimony, that latitude does not authorize them to select a figure entirely outside the evidence in answering a question. *See Callejo v. Brazos Elec. Power Co-op.,* 755 S.W.2d 73, 75 (Tex.1988). Appellant's third and fourth points are sustained.

In her fifth point, Campbell contends the trial court reversibly erred in excluding her exhibit 9 which she describes as C.D.'s employment application with Geldermann. Initially, from the record it appears that exhibit 9, as tendered, actually contained several sets of documents in addition to any application for employment. Those documents included an instrument entitled "employee address and telephone changes," an instrument entitled "Equifax services," as well as various letters from different people, handwritten notes, and personnel change notices. In making her tender, the record does not show that Campbell ever attempted to segregate the employment application from the remainder of the instruments.

Rule 901(a) of the Texas Rules of Civil Evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The thrust of Campbell's argument is predicated upon the fact that C.D. stated she had followed the procedure suggested to her in applying for a job with Geldermann (formerly Heinhold), that she "believed" she had filled out an employment application, that the application contained her social security number, and that the signature on the employment application "appear[ed] to be [her] signature." Campbell also contends the fact that items contained in exhibit 9 were produced by Geldermann in response to discovery requests was sufficient to authenticate them.

 Inasmuch as exhibit 9 was tendered as a whole, each of the documents in the exhibit should have been individually authenticated. *See Southwest Industries Inv. Co. v. Scalf,* 604 S.W.2d 233, 237 (Tex.Civ. App.—Dallas 1980, no writ). Parenthetically, we note C.D.'s testimony that she was unfamiliar with any Equifax report. Additionally, the mere fact that various instruments were received in response to a discovery request is not, in and of itself, sufficient to entitle their receipt into evidence. *Steenbergen v. Ford Motor Co.,* 814 S.W.2d 755, 759–60 (Tex.App.—Dallas 1991, writ denied), *cert.*

*denied,* —— U.S. ——, 113 S.Ct. 97, 121 L.Ed.2d 58 (1992).

 As Campbell recognizes, to reverse a judgment based upon an evidentiary ruling, it must be shown that the trial court abused its discretion in the admission or exclusion of the evidence and that a substantial right of the complaining party was affected. *Id.* Under this record, the trial court did not reversibly err in declining to admit Campbell's exhibit 9 as tendered. *See* Tex. R.Civ.Evid. 103(a). Campbell's fifth point is overruled.

 In her sixth point, Campbell attacks the refusal of the trial court to admit her tendered exhibit 13, which appears to be a letter from C.D. addressed to Robert Delia, president of Geldermann (then Heinhold). The thrust of her argument is that the letter was "probative of Geldermann's knowledge that C.D. Payne made mistakes and that she had suffered the consequences of mistakes and that Geldermann was negligent in its hiring of Ms. Payne." In the letter, the writer explains some of the history of C.D.'s relations with Kidder Peabody and Dean Witter and the events surrounding the America's Shopping Channel matter. C.D. never admitted she signed the letter and denied she knew anyone by the name of the addressee. Even so, citing *Dickerson v. Mack Financial Corporation,* 452 S.W.2d 552, 557 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.), Campbell asserts the letter was admissible because samples of C.D.'s signature were available in evidence for the jury to see and compare with the signature on the exhibit in order to determine the credibility of C.D.'s denials.

However, even assuming arguendo, the letter was admissible, there was other evidence concerning C.D.'s suspension and termination and Geldermann's imputed knowledge of such matters. In addition, the exhibit was tendered as bearing upon the question of Geldermann's alleged negligence in its hiring and supervision of C.D. In its answer to Question 18, the jury found that Geldermann was negligent in those respects. Again, as we noted in our discussion of the preceding point, the trial court's refusal to admit the evidence, even if error, would not require

reversal. *See* Tex.R.Civ.Evid. 103(a). Campbell's sixth point is overruled.

In her seventh point, Campbell contends the trial court reversibly erred in failing to submit her requested jury question concerning whether C.D. had apparent authority to act for Geldermann in her dealings with Campbell. Under Rule 277 of the Texas Rules of Civil Procedure, the trial court is required to submit fact questions raised by the pleadings and the evidence controlling the disposition of the case. *Laughlin v. Federal Deposit Ins. Corp.*, 657 S.W.2d 477, 480–81 (Tex.App.—Tyler 1983, no writ). Under Rule 278, if the question is one relied upon by a party, as in this case, the failure to submit the question does not require reversal unless the submission of the question was requested in writing and was tendered in substantially correct wording by the party complaining of the omission. While they do contend Campbell was not entitled to the submission of the question, neither C.D. nor Geldermann challenge the form of the request.

In support of her proposition, Campbell cites the testimony that C.D. was an employee of Heinhold (now Geldermann) and, as such, she had business cards, letterhead, a receptionist, etc. There is also testimony that Campbell discussed some investment possibilities with C.D. at her office and that Campbell left her a second check in the amount of $75,000 payable to C.D. (under her former name of C.D. Pointer), with C.D.'s office at Heinhold in an envelope with directions to give it to C.D. There is also testimony that subsequent to C.D.'s leaving Heinhold, another Heinhold employee helped Campbell with her Mesa Petroleum stock.

Apparent authority is the power of an agent to affect the legal relations of another person by transactions with third persons. Apparent authority in Texas is based upon estoppel and may arise either from a principal knowingly permitting an agent to hold herself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe the agent has the authority the agent purports to exercise. An agent acting within the scope of the agent's apparent authority binds a principal as though the principal had performed the act. *Ames v. Great Southern Bank*, 672 S.W.2d 447, 450 (Tex.1984). Thus, a prerequisite to a proper finding of apparent authority is evidence of conduct by a principal, relied upon by the party asserting apparent authority, which would lead a reasonably prudent person to believe an agent had authority to act for the principal. *Id.* The doctrine does not apply unless the person dealing with the agent was misled by the representation or conduct of the principal. The person dealing with the agent must have been induced to act, to his prejudice, by reason of the principal's conduct after exercising due diligence to ascertain the truth. *Federal Deposit Ins. Corp. v. Texas Bank of Garland*, 783 S.W.2d 604, 607 (Tex.App.—Dallas 1989, no writ).

As applied to this case, in order to invoke the doctrine, the evidence must have been sufficient to raise a fact question as to whether Campbell was induced to enter into the transactions in question here because of Geldermann's conduct. There is no evidence in the record that Geldermann had any knowledge of C.D.'s transactions with Campbell, nor is there evidence that Geldermann's employment of C.D. led to those transactions. Campbell testified she had no knowledge of Geldermann (Heinhold) prior to C.D.'s employment there and that she followed C.D. to Geldermann only because of her previous dealings with C.D. Nothing in this record would indicate that a reasonably prudent person in Campbell's position would believe that C.D., by accepting checks made out to herself and to her husband's company in exchange for personal notes of obligation, was attempting to bind Geldermann or was acting in its behalf. Accordingly, the trial court did not err in declining to submit the requested question. Campbell's seventh point is overruled.

In her eighth point, Campbell submits the trial court reversibly erred in refusing to allow her to call Geldermann's corporate representative, Ned Bennett, as a witness. In support of that contention, Campbell points out that, although she had not

identified Bennett as a potential witness or a person with knowledge of relevant facts, he had been identified by Geldermann as a person with knowledge of hiring policies and supervisory procedures as well as having been president of Geldermann since November 1, 1987. In addition, Campbell contends Bennett's exclusion was particularly harmful inasmuch as he would have been able to identify certain documents she was attempting to introduce into evidence which apparently bore on the question of Geldermann's negligence in hiring C.D.

As we have pointed out above, Rule 103(a)(2) of the Texas Rules of Civil Evidence provides that error may not be predicated upon a ruling excluding evidence unless a substantial right of the party is affected and the substance of the excluded evidence is made known to the court by offer. As far as this record shows, the only circumstances pertaining to Bennett's testimony are his brief statement that he became president of Geldermann on November 1, 1987, a time subsequent to the events giving rise to this suit, and the statements of Geldermann's counsel, addressed to the judge, that Bennett "sure wouldn't be able to identify any of these documents because he hasn't seen them before." This is not sufficient to show the substance of the testimony Campbell sought to produce from the witness. Additionally, in view of the jury's finding that Geldermann was negligent in its hiring or supervision of C.D., the exclusion does not appear to have deprived Campbell of a substantial right.

■ Moreover, it is undisputed that Bennett had not been listed by Campbell in response to interrogatories. Even so, pursuant to Rule 181 of the Texas Rules of Civil Procedure which provides that either party to a suit may examine the other party as a witness, and citing the decision in *E–Z Mart Stores, Inc. v. Terry,* 794 S.W.2d 63 (Tex. App.—Texarkana 1990, writ denied), Campbell contends she has an absolute right to call the witness as the representative of an adverse party.

It is true that the import of the decision in *E–Z Mart* is as Campbell contends. However, since the time of that decision, the courts have had an opportunity to consider the impact of our supreme court's decision in *Smith v. Southwest Feed Yards,* 835 S.W.2d 89 (Tex.1992) and have reached a different conclusion. *See Varner v. Howe,* 860 S.W.2d 458, 464 (Tex.App.—El Paso 1993, no writ) and *Brekalo v. Ballard,* 836 S.W.2d 783, 785 (Tex.App.—Fort Worth 1992, no writ). We believe the later cases reached the correct result, *i.e.,* absent a showing of good cause, an undisclosed party is not removed from the automatic exclusion provisions of Rule 215(5) of the Texas Rules of Civil Procedure. For all of the above reasons, the trial court did not reversibly err in excluding Bennett's testimony. Campbell's eighth point is overruled.

■ In her ninth point, Campbell avers the trial court erred in excluding the testimony of Phyllis Jackson and Ned Bennett. For the reasons expressed in our discussion of the preceding point, the trial court did not err in excluding the testimony of Ned Bennett. With reference to Phyllis Jackson, Campbell contends the exclusion of her testimony was harmful because it "was necessary to correct untruthful testimony and loss of memory of C.D. Payne, an adverse witness," *viz.,* testimony concerning the hiring of C.D. and information available to Geldermann (Heinhold) at the time of C.D.'s hiring.

It has become axiomatic that by provision of Rule 215(5) of the Texas Rules of Civil Procedure, failure to identify witnesses in response to opposing parties' interrogatories constitutes grounds for excluding the witnesses at trial. *Sharp v. Broadway Nat. Bank,* 784 S.W.2d 669, 671–72 (Tex.1990); *Gutierrez v. Dallas Independent School District,* 729 S.W.2d 691, 693–94 (Tex.1987); *Yeldell v. Holiday Hills Retirement and Nursing Center, Inc.,* 701 S.W.2d 243, 246–47 (Tex.1985). However, the exclusion sanction is neither designed nor intended to punish a litigant who cannot, in the exercise of good faith and due diligence, respond to a discovery request in a timely manner. Even so, the parties should not be allowed to rely upon the good cause exception as a means to evade their duty to engage in full discovery. *Clark v. Trailways, Inc.,* 774 S.W.2d 644, 646 (Tex.1989). For example, mere inadvertence

or neglect in failing to identify a witness in response to discovery requests is not sufficient to demonstrate good cause. *E.F. Hutton & Co., Inc. v. Youngblood,* 741 S.W.2d 363, 364 (Tex.1987) (per curiam). Similarly, the absence of surprise, unfairness, or ambush is not, alone, sufficient to show good cause. *Sharp,* 784 S.W.2d at 671. Additionally, the fact that an unidentified witness possesses special knowledge is not sufficient to establish good cause for admitting the testimony. *Clark,* 774 S.W.2d at 646.

Pointing out that C.D. and Geldermann failed to identify Jackson as a person with knowledge, .even though she had been an employee of Geldermann and had interviewed C.D., Campbell argues that they "violated the provisions and spirit of Rule 166b(6)(a)(1) by failing to identify Phyllis Jackson." As we understand Campbell's argument, the other parties' failure to list Jackson as a person with relevant knowledge contributed to her lack of knowledge of Jackson's potential testimony. Thus, as she had no knowledge of Jackson's potential as a witness at the time her listing of potential witnesses was made, Campbell's listing of potential witnesses was true and correct at the time it was made. Campbell thus contends that because of the other parties' untruthful conduct, she should not have been required to supplement her listing and, by excluding Jackson's testimony, the trial court, in effect, rewarded the other parties' misconduct. We disagree.

Nothing in this record indicates any attempt on Geldermann's part to mislead Campbell about Jackson's familiarity with the facts or to conceal any such knowledge from Campbell. Indeed, the dialogue of counsel at the time of the tender of Jackson's testimony reveals that "right around" March 22, 1991, Jackson met with Campbell's attorney and let him have access to her personal files and documents. Thus, Campbell had knowledge of the substance of Jackson's potential testimony some two years before the trial on this case, which began on March 29, 1993, but still did not list Jackson in her second supplemental response filed February 19, 1992.

Rule 166b(6)(a) of the Texas Rules of Civil Procedure provides that a party is under a duty to supplement a response to interrogatories when the party knows the response was incorrect or incomplete when made or when the party knows the response is no longer true and complete and circumstances are such that the failure to amend is, in substance, misleading. To ensure the benefit of Jackson's testimony, Campbell' should have supplemented her response.

Moreover, Jackson's proffered testimony . was in the area of Geldermann's negligence in hiring C.D. As we have noted, Campbell received a favorable jury verdict on that question. Under this record, the trial court did not reversibly err in declining to receive Jackson's testimony. Campbell's ninth point is overruled.

In her tenth point, Campbell complains of the failure of the trial court to submit her requested jury question on the statute of limitations. In particular, she argues the question submitted only inquired about the date she discovered, or through the exercise of reasonable diligence should have discovered, "the nature of her injury," rather than inquiring as to the date she discovered "all the false, misleading or deceptive acts or practices" or her ·"cause of action." She asserts that the question was improper as it related to her DTPA and negligence claims in that it improperly focused on injury, *i.e.,* her loss of money, instead of properly focusing upon her discovery of her right of action or of the acts which caused her injury.

Rule 274 of the Texas Rules of Civil Procedure provides that a party objecting to a charge must point out distinctly the objectionable matter and the basis of the objection. In this instance, Campbell's submission of what she considered to be a correct question was not sufficient to preserve any alleged error. A mere request to submit an instruction or question different from that submitted by the trial court does not sufficiently point out the objectionable matter in the submitted question and will not be considered a sufficient "objection" for the purposes of Rule 274. *Religious of the Sacred Heart v. Houston,* 836 S.W.2d 606, 613–14 (Tex.1992); *Garza v. Southland Corp.,* 836

S.W.2d 214, 218 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Jon–T Farms Inc. v. Goodpasture, Inc.,* 554 S.W.2d 743, 751 (Tex. Civ.App.—Amarillo 1977, writ ref'd n.r.e.).

■ We do note Campbell's closing objection in which counsel states he also "objects to the Court's charge in its entirety to the extent it does not include the requested questions and instructions." However, that type of general objection is subject to the same vice as the requested charge in that it does not sufficiently point out the objectionable matter and the reasons why the submitted question is insufficient. *Diamond Shamrock Refining and Marketing Co. v. Mendez,* 809 S.W.2d 514, 521 (Tex.App.—San Antonio 1991), *aff'd in part, rev'd in part,* 844 S.W.2d 198 (Tex.1992). *See also Cosgrove v. Grimes,* 774 S.W.2d 662, 666 (Tex.1989). Campbell's tenth point is overruled.

Our disposition of Campbell's first ten points obviates the necessity for a lengthy discussion of her eleventh point. In that point, she contends cumulative errors pervaded the trial and caused the rendition of an improper verdict, or that the cumulative effect of the errors alleged in her first ten points requires reversal. Suffice it to say, we find no cumulative series of error requiring a blanket reversal of the trial court's judgment and overrule Campbell's eleventh point.

In two cross-points, C.D. posits that by submitting the following question, the trial court sufficiently erred to entitle her to a take-nothing judgment in her favor. The question reads:

*Question No. 4*

Do you find that the defendant, C.D. Payne, a) made representations to the plaintiff, Magdalene Campbell, that were material and false, b) with the intention that the representations should be acted upon by the plaintiff, c) that the plaintiff acted in reliance upon the representations and d) that such conduct, if any, was a proximate cause of damage to the plaintiff?

In support of her contention, C.D. asserts the question failed to include an essential element of recovery for fraud in that it failed to inquire whether the "false statements were made knowingly by the defendant C.D. Payne, knowing that they were false at the time they were made, or an inquiry as to whether or not the defendant C.D. Payne had intended at the time of the representations, that the obligations under the agreement would not be preformed [sic]."

■ In *Stone v. Lawyers Title Insurance Co.,* 554 S.W.2d 183 (Tex.1977), the court instructed that in order to recover on a fraud claim, a plaintiff must prove 1) that a material representation was made; 2) that it was false; 3) that the speaker knew the material representation was false when made or made it without any knowledge of the truth and made it as a positive assertion; 4) that the speaker made the material representation with the intent that it be acted upon by the other party; 5) that the party acted in reliance upon the material representation; and 6) the party incurred damages. *Id.* at 185.

■ In *Wolf v. Fernandez,* 733 S.W.2d 695 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.), the court explicated that to support a cause of action when the alleged misrepresentation concerned an action to be taken in the future, the plaintiff must establish: 1) the defendant made a promise to the plaintiff to perform an action in the future; 2) at the time the promise was made the defendant did not intend to perform; 3) the plaintiff relied upon the promise to his detriment; and 4) the plaintiff suffered damage thereby. *Id.* at 697.

■ It is the rule that if a trial court's charge fairly and fully presents all controlling issues to the jury, it is not error to refuse to submit additional issues or instructions which are mere shades or variations of the issues already submitted. *Johnson v. King,* 821 S.W.2d 425, 427 (Tex.App.—Fort Worth 1991, writ denied).

■ Rule 277 of the Texas Rules of Civil Procedure requires the trial court, whenever reasonable, to submit a case by broad form submissions. The submission of the question to the jury as to whether C.D. made material false representations to Campbell necessarily included the proposition that she must have

known the representations were not true or they would not be false. Further, if the representations were false and made with the intention that they be relied upon by Campbell, C.D. necessarily must not have intended to carry out those representations in the future or they would not have been false. Accordingly, the question as submitted was sufficient to properly cover the requisite elements for a fraud recovery. C.D.'s first cross-point is overruled.

■ In her second point, C.D. argues the trial court erred in submitting a jury question concerning her culpable mental state when the representations were made inasmuch as the question had no foundation in the pleadings. The question read:

*Question No. 5*

Did the defendant, C.D. Payne:

a. know the representations were false when made; or

b. make the representations recklessly, without any knowledge of their truth and as a positive assertion?

In paragraph IX of Campbell's third amended original petition she alleges:

IX. Fraud: Defendants received Plaintiff's money through the use of fraud. Specifically, Defendants made certain representations and failed to admit or make material facts known with the intent that the Plaintiff would rely on such representations with the admitted facts. Plaintiff did, in fact, rely on those representations and admitted facts to her detriment. Such stated facts and/or projections made were not true at the time they were made. Plaintiff's reliance was the proximate cause of actual damages and was the reason that she invested money with the Defendants. Such fraud was the proximate cause of actual damages. Because the fraud was intentional the punitive damages are warranted.

Because the pleadings fail to specifically allege that C.D. knew the representations were false when made, or that she made the representations recklessly, without any knowledge of their truth and as a positive assertion, C.D. contends they were not suffi-cient to warrant submission of the above question. We disagree. In the absence of a special exception, the allegation that appellees made money through fraud and made intentional representations that were not true at the time they were made with the intent that Campbell would rely upon them is sufficient to justify the submission of the question. C.D.'s second cross-point is overruled.

In final summary, Campbell's third and fourth points are sustained and the remainder of her points are overruled. Both of C.D.'s cross-points are overruled. Under the jury's verdict, the trial court correctly ruled that Geldermann was entitled to a take-nothing judgment against it. However, our sustention of Campbell's third and fourth points requires that we remand that portion of her suit to the trial court.

Accordingly, that portion of the trial court's judgment providing that Campbell take nothing against Geldermann is severed and, as severed, affirmed. The remainder of the judgment providing that Campbell take nothing against C.D. is reversed and that portion of Campbell's cause remanded to the trial court.