GROTJOHN PRECISE CONNEX-
IONES INTERNATIONAL, S.A., Dale
R. Grotjohn, W.L. Chancey, and
Frank Whitten, Appellants,

v.

JEM FINANCIAL, INC., J.W. Taylor,
Jr., Martin Hamilton, John Adams,
Sr., and Larry McAlister, Appellees.

No. 06–98–00161–CV.

Court of Appeals of Texas,
Texarkana.

Argued July 28, 1999.

Decided Feb. 18, 2000.

Brad Jackson, Jackson & Matthews, Dallas, John A. Hixson, Arlington, for appellant.

Robert H. Holmes, The Holmes Law Firm, Dallas, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

# O P I N I O N

Opinion by Justice ROSS.

This is an appeal of a summary judgment granted in favor of JEM Financial, Inc., J.W. Taylor, Jr., Martin Hamilton, John Adams, Sr., and Larry McAlister (JEM et al.) on their securities fraud claim. Grotjohn Precise Connexiones International, S.A. (GPCI), Dale Grotjohn, W.L. Chancey, and Frank Whitten (Grotjohn et al.) appeal contending that the trial court considered improper summary judgment evidence and struck proper summary judgment evidence in granting the summary judgment in favor of JEM et al. Grotjohn et al. and Whitten also complain that the trial court erred in overruling their own respective summary judgment motions. Finally, Grotjohn et al. and Whitten contend that the trial court improperly disposed of the counterclaim filed by Grotjohn et al. without a trial on the merits or a summary judgment motion.

JEM et al. filed suit alleging securities fraud. According to JEM et al., Taylor and a colleague met with Dale Grotjohn (Grotjohn) and Chancey on November 26, 1994, to discuss the possibility of Taylor and his associates investing in a Spanish corporation, Precise Connexiones International, S.A. (PCI) or some form of the company, such as GPCI. Grotjohn and Chancey allegedly supplied Taylor with an "offering memorandum" describing the company and the investment opportunity. According to the memorandum, GPCI was a Spanish corporation formed by Grotjohn, and GPCI had just purchased Precise Connections, Inc. of Duncanville, Texas (Precise Connections). The purpose of the venture was to utilize the knowledge of Precise Connections to build a similar operation in Spain because the Spanish government was offering major incentives to bring in such companies. Also according to the memorandum, Grotjohn had spent $850,000.00 of his own money on the project, and the project needed only $250,000.00 in bridge funding to complete and receive the first grants and subsidies from the Spanish government. At the time of the meeting on November 26, 1994, JEM et al. contend that representations were made that only $150,000.00 in bridge funding was needed because the other $100,000.00 had already been raised.

On December 7, 1994, Taylor, Hamilton, Adams, and McAlister signed individual agreements entitled "PROMISSORY NOTE/CONVERTIBLE DEBENTURE" listing Grotjohn as the "borrower" and each respective individual as the "lender." [1] Each individual "loaned" $25,000.00 to Grotjohn for a period of ninety days at a monthly interest rate of ten percent. The lender had an option to extend for another ninety days at the completion of the original ninety-day term, but the interest for the extension would be fifteen percent per annum. The lender also had the option, at any time, to convert all or any part of the

---

1. The actual wording of this document is:

**PROMISSORY NOTE / CONVERTIBLE DEBENTURE**

This agreement is between Dale R. Grotjohn, "Borrower", and [Lender] "Lender".

Lender agrees to lend Borrower the sum of * *25,000.00 for a period of 90 days from the date of this agreement. Interest will be charged at the rate of 10% per month for the period of the loan.

OPTIONS

1. At the option of the Lender, the note may be extended an additional 90 days after the first 90 day period.

A. If this option is exercised, Borrower will pay all interest due to the date of renewal.

B. The interest rate will then revert to 15% per annum for the renewal period.

2. At any time during the initial term and the renewal period of this agreement, Lender will have the option of converting all or any portion of the principal and interest to shares in the Spanish company, Precise Connexiones International, S.A. at a price of $0.40 per share.

Borrower Lender

Dale R. Grotjohn [Lender]

principal into shares in the Spanish company, GPCI, at a price of $0.40 per share. JEM Financial, Inc. contributed $25,000.00, and on December 28, 1994, entered into an identical agreement with Grotjohn.

JEM et al. contend that they subsequently determined that the representations made to them regarding the Spanish corporation were untrue and fraudulent. They also determined that Grotjohn, Chancey, and Whitten knew of the falsity of the representations. JEM et al. demanded the return of their money during May and June of 1995. Attorney Robert Holmes sent a demand letter on behalf of JEM et al. on June 13, 1995, demanding payment of $33,204.00 for each investor.

JEM et al. filed suit on November 11, 1995, alleging securities fraud. Grotjohn et al. filed a counterclaim on March 25, 1997, alleging that the interest agreed to in the promissory notes/convertible debentures and demanded by JEM et al. was usurious. Grotjohn et al. also filed a motion for summary judgment on March 28, 1997, claiming that JEM et al. had charged Grotjohn et al. usurious interest.

JEM et al. filed a motion for partial summary judgment on July 22, 1997, and made the following claims:

The debentures were investment securities under TEX.REV.CIV. STAT. ANN. art. 581–4 (Vernon Supp.1999) (the Act).

Grotjohn and Chancey, who were not dealers, salesmen, or agents licensed under the Act, sold the debentures to JEM et al., and such debentures were not registered under the Act.

Grotjohn, Chancey, Whitten, and others *or* Grotjohn and Chancey, acting under the control of Whitten, sold the debentures to JEM et al. based upon untruths, omissions, and fraudulent practice.

Grotjohn, Chancey, Whitten, and others *or* Grotjohn and Chancey, acting under the control of Whitten, made fraudulent statements/representations/failed to disclose material facts to Taylor and his associate at the November 1994 meeting

in order to induce JEM et al. to purchase the debentures.

Grotjohn, Chancey, Whitten, and others are liable to JEM et al. under the Act.

Whitten, as director of and attorney for GPCI/PCI, was directly or indirectly in control of Grotjohn and Chancey in connection with the sale of the debentures to JEM et al.

In support of the motion for partial summary judgment were two affidavits. One from Taylor and one from J. Thomas Miller, president of JEM Financial, Inc. Both affidavits allege that certain representations made to Taylor and Miller were untrue and fraudulent and that Grotjohn and Chancey had full knowledge that the representations were false. The affidavits also state that the representations of Grotjohn and Chancey were relied on by Taylor and Miller, individually and on behalf of the others, in investing their $25,000.00.

In response to the motion for partial summary judgment, Grotjohn et al. first objected to the affidavit of Miller and contended that the affidavit failed to show that he had personal knowledge of the events in his affidavit because it does not state that he was at the November 26, 1994, meeting. Grotjohn et al. also contended:

They did not communicate to any of JEM et al. any of the misrepresentations listed in the offering memorandum.

They did not draft or give the offering memorandum to JEM et al.

Whitney and Chancey did not draft or participate in the drafting of the promissory notes made by Grotjohn and payable to JEM et al. Whitney and Chancey did not receive any of the proceeds.

Whitney and Chancey did not participate in the Spanish corporation, GPCI, and deny participating in the company as officers and/or directors.

GPCI could not be liable for acts which occurred before December 19, 1994, the date of its formation.

Transactions between JEM et al. and Grotjohn were personal loans to Grotjohn, and Whitney and Chancey are not liable.

Whitney and Chancey never controlled Grotjohn or his action, and he was not their agent.

The promissory notes were not investment contracts or securities.

Defendant Frank Whitten filed a motion for summary judgment on July 31, 1997, contending that the transaction involved in the underlying suit was a personal transaction between JEM et al. and Grotjohn. Whitten claims he was never a party to the transaction. Further, Whitten contended that although he was the secretary of GPCI, he had no control over Grotjohn or Chancey, GPCI's president and vice-president, respectively.

JEM et al. objected to the affidavit supporting Whitten's motion for summary judgment, contending that it contained conclusory statements and legal conclusions, and was made by an interested witness.

Whitten later filed a second motion for summary judgment on November 19, 1997, which was a no-evidence summary judgment motion, alleging that Whitten did not engage in or have knowledge of any of the misrepresentations made to JEM et al. as alleged in the suit.

On January 16, 1998, the trial court conducted a hearing on the four pending motions for summary judgment. At that hearing, the trial court sustained twenty-three of JEM et al.'s objections to the affidavit of Grotjohn. At the time of the hearing, Grotjohn et al. filed objections to the affidavits of Taylor, Miller, and Holmes (JEM et al.'s attorney). JEM et al. objected to these objections on the ground that they were filed late. The hearing was then recessed because one of the attorneys had another obligation.

On February 12, 1998, the trial court granted a motion continuing the trial date and continuing all other provisions of the scheduling order which the court had entered on January 12. On February 25, 1998, the trial court signed an order denying Whitten's no-evidence summary judgment motion. On February 27, 1998, the trial court signed an order granting the partial summary judgment motion filed by JEM et al. and signed an order sustaining JEM et al.'s objections to Grotjohn's late-filed objections to JEM et al.'s summary judgment evidence. The partial summary judgment and its findings coincided with the allegations contained in the motion for partial summary judgment.

The trial court entered the following orders on the following dates after the granting of the motion for partial summary judgment:

March 3, 1998 Order sustaining all objections by JEM et al. to the affidavit of Whitten attached to Whitten's motion for summary judgment

March 4, 1998 Denial of Whitten's motion for summary judgment filed on July 31, 1997

March 4, 1998 Denial of Grotjohn et al.'s motion for summary judgment claiming usury filed March 28, 1997

March 4, 1998 Order sustaining all objections by JEM et al. to the affidavit of Grotjohn attached to Grotjohn's motion for summary judgment

March 23, 1998 Order overruling a motion to compel discovery filed by Grotjohn, Chancey, and Whitten

March 23, 1998 Order overruling Grotjohn et al.'s objections to the affidavit of Miller

Grotjohn et al. filed a motion for rehearing on the partial summary judgment motion. That motion was also overruled on March 23, 1998.

The partial summary judgment order provided that all matters not disposed of therein were set for trial on the merits on March 16, 1998. All parties appeared at the trial setting, and JEM et al. nonsuited their claims for attorneys' fees as to

Grotjohn and Chancey. The trial court signed a final judgment on June 30, 1998, which incorporated the partial summary judgment and the agreement as to attorneys' fees. The judgment purported to dispose of all issues in the case.

Grotjohn et al. filed a motion for new trial in which it contended that the trial court erred in (1) sustaining JEM et al.'s objections to Grotjohn et al.'s summary judgment evidence; (2) granting summary judgment against Whitten; (3) failing to sustain Grotjohn et al.'s objections to the summary judgment evidence; (4) granting JEM et al.'s motion for summary judgment; and (5) granting summary judgment against Grotjohn et al. on their counterclaims without a motion for the same. Grotjohn et al. also complained of the denial of their motion to compel discovery. The motion for new trial was apparently overruled by operation of law.[2]

## ANALYSIS

We review a summary judgment de novo. Accordingly, when cross-motions for summary judgment are filed, we consider the evidence supporting all of the motions. *DeBord v. Muller*, 446 S.W.2d 299, 301 (Tex.1969). We uphold a Rule 166a(c) summary judgment only if the summary judgment record establishes there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law on a ground set forth in the motion. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether the summary judgment record establishes the absence of a genuine issue of material fact, we view as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve all doubts in its favor. *Id.* Summary judgment is particularly inappropriate when matters that are inherently those for a fact finder-such as intent, knowledge,

motive, reliance, and the like-constitute essential elements of recovery or defense. *Hilton v. Texas Inv. Bank, N.A.*, 650 S.W.2d 545, 547 (Tex.App.-Houston [14th Dist.] 1983, no writ); *Kolb v. Texas Employers' Ins. Ass'n*, 585 S.W.2d 870, 873 (Tex.Civ.App.–Texarkana 1979, writ ref'd n.r.e.).

We now determine whether the trial court erred in granting the summary judgment in favor of JEM et al. Grotjohn et al. and Whitten asserted points of error claiming that the trial court erred in granting the partial summary judgment in favor of JEM et al.

### A. Grotjohn et al.'s Contentions

Grotjohn et al. contend that the trial court erred in granting the motion for partial summary judgment because: (1) the motion is not supported by competent summary judgment evidence; (2) the trial court improperly struck nearly all of Grotjohn et al.'s summary judgment response affidavits; and (3) the trial court did not consider Grotjohn et al.'s objections to the affidavits supporting JEM et al.'s motion for partial summary judgment.

In their first contention, Grotjohn et al. challenge the affidavits of Taylor and Miller, filed in support of the motion for summary judgment, on the ground that they are not unequivocally based on the personal knowledge of the affiants. In their response filed on August 16, 1997, Grotjohn et al. objected to Miller's affidavit as not being based on personal knowledge. At the time of the hearing on January 16, 1998, Grotjohn et al. objected to Taylor's affidavit as not being based on personal knowledge. The trial court overruled as untimely all objections made to the affidavits.

■ To constitute proper summary judgment evidence under Rule 166a(f), an affidavit must be made on personal knowledge, set forth facts which would be admis-

---

2. There is no signed order in the clerk's record or any indication that a hearing was held on the motion.

sible in evidence, and show the affiant's competence. TEX.R. CIV. P. 166a(f); *Fisher v. Yates,* 953 S.W.2d 370, 383 (Tex.App.-Texarkana 1997), *writ denied per curiam,* 988 S.W.2d 730 (Tex.1998). The allegations must be direct, unequivocal, and such that perjury is assignable. *Fisher,* 953 S.W.2d at 383.

■ Objections to an affidavit in support of a summary judgment motion on the basis that the affidavit is not based on personal knowledge is a defect of form. *See McBride v. New Braunfels Herald–Zeitung,* 894 S.W.2d 6, 8 (Tex.App.-Austin 1994, writ denied). Defects of form are waived if not pointed out to the trial court before summary judgment is rendered. *Life Ins. Co. of Virginia v. Gar–Dal, Inc.,* 570 S.W.2d 378, 381 (Tex.1978); *Classen v. Irving Healthcare Sys.,* 868 S.W.2d 815, 822 (Tex.App.-Dallas 1993), *rev'd on other grounds,* 898 S.W.2d 300 (Tex.1995).

■ Because Grotjohn et al. filed their objections to the affidavits before the trial court rendered the partial summary judgment, the objections were timely and the trial court erred in overruling them on the basis that they were not timely.[3]

Grotjohn et al. complain that the following statements contained in the two affidavits show that the affidavits were not based solely on personal knowledge. The first affidavit stated:

From my direct personal dealings, conversations and meetings with Dale Grotjohn ("Grotjohn"), W.L. Chancey ("Chancey") and Frank Whitten ("Whitten") and from a personal investigation of these matters alleged in the above-referenced lawsuit, I have personal knowledge of all facts and statements

contained herein and they are true and correct.

The second affidavit stated:

From my direct personal dealings, conversations and meetings with Dale Grotjohn ("Grotjohn"), W.L. Chancey ("Chancey") and Frank Whitten ("Whitten") and Mark Ott ("Ott") and from a personal investigation of these matters alleged in the above-referenced lawsuit, I have personal knowledge of all facts and statements contained herein and they are true and correct.

In contending that the reference to "personal investigation" renders the affidavits invalid, Grotjohn et al. rely on *Humphreys v. Caldwell,* 888 S.W.2d 469 (Tex. 1994). There, the Texas Supreme Court reviewed the sufficiency of certain affidavits and stated:

The affidavits before us state that the affiant's statements are based on his "own personal knowledge and/or knowledge which he has been able to acquire upon inquiry" and, hence, fail to unequivocally show that they are based on personal knowledge.

*Id.* at 470.

■ The affidavit in *Humphreys* is distinguishable from those in the present case. The affidavits in the present case refer to a personal investigation of these matters as to how the affiants became familiar with the facts, and this, along with conversations, dealings, and meetings, established the affiant's personal knowledge. In the *Humphreys* case, the affidavit stated that the statements were based on the affiants' own personal knowledge and/or knowledge which he had been able to acquire upon inquiry. The present affidavits, unlike *Humphreys,* state un-

**3.** In the order overruling Grotjohn et al.'s objections, the trial court stated that "[Grotjohn et al.] failed to abide by the Local Rules requiring a setting with a minimum of 3–days notice; and ... sought no leave of Court; therefore, the Court SUSTAINS [JEM et al.'s] Objections to the Court's consideration of the [objections to the affidavits]."

This Court was not provided a copy of the local rules to which the trial court refers, so we are constrained to follow the case law in this matter which has been cited above. Additionally, we question whether the local rules can impose a three-day minimum requirement for the filing of objections when the Texas Supreme Court does not require such.

equivocally that the affiants have personal knowledge of all the facts; therefore, the affidavits are adequate.

■ Grotjohn et al. also complain that the affidavits of Taylor and Miller contain legal and factual conclusions which cannot constitute proper summary judgment proof. An objection to an affidavit on the ground that it states only a legal conclusion is one that relates to a defect of substance. *See Bell v. Moores*, 832 S.W.2d 749, 756 (Tex.App.-Houston [14th Dist.] 1992, writ denied). Such defects may be raised for the first time on appeal. *Schultz v. Rural/Metro Corp.*, 956 S.W.2d 757, 761 n. 4 (Tex.App.-Houston [14th Dist.] 1997, no pet.). Affidavits consisting of nothing more than conclusions or expressions of subjective belief are not competent summary judgment proof. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984).

■ While we agree that portions of these affidavits do contain legal conclusions, we may still review the factual assertions contained in the affidavits to determine if those assertions are enough to support the summary judgment. *See Lesbrookton, Inc. v. Jackson*, 796 S.W.2d 276, 288 (Tex.App.-Amarillo 1990, writ denied) (finding that even though affidavit contained legal conclusions that could not be considered by trial court, affidavit could be considered for the factual assertions contained therein); *see also Muhm v. Davis*, 580 S.W.2d 98, 102 (Tex.Civ.App.–Houston [1st Dist.] 1979, writ ref'd n.r.e.).

Although the affidavits of Taylor and Miller do contain legal conclusions and expressions of subjective belief, they also contain recitations of fact which may properly be considered as summary judgment evidence. We should consider the evidence properly raised in the affidavits and ignore the improper evidence as we consider whether the granting of the motion for summary judgment was proper.

Grotjohn et al. also argue that the trial court improperly sustained essentially all of JEM et al.'s objections to the affidavits which Grotjohn et al. filed in response to JEM et al.'s motion for partial summary judgment. In response to the motion for partial summary judgment, Grotjohn et al. filed affidavits from Grotjohn, Chancey, and Whitten. The court sustained all of the objections made by JEM et al. to the affidavits of Chancey and Whitten, and sustained twenty-three of the twenty-six objections to Grotjohn's affidavit. The objections to these affidavits included assertions that various statements in the affidavits were conclusory, recite subjective beliefs, are statements of interested witnesses, contain hearsay, contain legal conclusions, are attempts of the affiants to testify as experts, and are inconsistent with sworn statements of the affiants in the judicial proceedings.

We have reviewed the affidavits and determined that the affidavits do contain competent summary judgment evidence. We will consider the evidence properly raised in the affidavits and ignore any improper evidence. *See Lesbrookton, Inc.*, 796 S.W.2d at 288.

■ We now turn to the trial court's granting of the motion for partial summary judgment. Summary judgment for a plaintiff will only be affirmed if the record on appeal establishes that the movant has conclusively proven all of the essential elements of their cause of action as a matter of law. *Johnson v. Walker*, 824 S.W.2d 184, 186 (Tex.App.-Fort Worth 1991, writ denied). JEM et al. moved for summary judgment under the antifraud provision of the Texas Securities Act. TEX.REV.CIV. STAT. ANN. art. 581–33(A)(2) (Vernon Supp.1999). The elements of an action arising under this provision of the Securities Act include an offer or sale of a security by means of either an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of all of the circumstances, not misleading. JEM et al. must have conclusively established each of

these elements in order to be entitled to summary judgment.

■ First, JEM et al. must have established that the instrument in this case is a security. In the final judgment, the court recited that the note payable/convertible debenture was a security within the meaning of Article 581–4(A) of the Texas Securities Act. Tex.Rev.Civ. Stat. Ann. art. 581–4(A) (Vernon Supp.1999). Grotjohn et al. contend that the instruments constitute only loans and are not securities under the Act. The determination of whether the documents are securities within the purview of our Texas statute is a matter of law and is determined de novo. *Campbell v. C.D. Payne and Geldermann Sec., Inc.*, 894 S.W.2d 411, 417–18 (Tex.App.-Amarillo 1995, writ denied); *S.E.C. v. Life Partners, Inc.*, 87 F.3d 536, 540–41 (D.C.Cir.1996). Because the Texas Securities Act is so similar to the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas Act. *See Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637 (Tex. 1977). The court in *Campbell* adopted the United States Supreme Court's family resemblance test developed in *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), to determine if a note is a security as defined by the statute. *Campbell*, 894 S.W.2d at 418.

■ Under the *Reves* family resemblance test, every note is presumed to be a security, and that presumption may be rebutted only by either (1) a showing that the note in question bears a strong resemblance to notes that the Court specifically said are not securities, or (2) a determination that another category should be added to the list of notes which are not securities, to which the note in question bears a strong resemblance. *Reves*, 494 U.S. at 66–67, 110 S.Ct. 945. The notes which the Court has deemed *not* to be securities are: ("... the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or

some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)") ... [and] "notes evidencing loans by commercial banks for current operations."

*Id.* at 65, 110 S.Ct. 945. The comparison between the note in question and the notes described above is to be made by analyzing the note within a framework of four factors: (1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some other factor or regulatory scheme significantly reduces the risk of the instrument, making the application of the securities laws unnecessary. *Id.* at 66–67, 110 S.Ct. 945. If the note in question bears a strong resemblance, in terms of the four factors, to instruments enumerated by the Court in the list of instruments found not to be securities, then the presumption that the note is a security is rebutted and the note is deemed not to be a security. If a strong resemblance is not found, then the court conducts additional analysis, by applying the same four factors, to determine if a new category should be added to the judicially crafted list of instruments which are not securities.

■ The first factor in the family resemblance test is the motivation for the transaction. *Id.* If the seller/borrower's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer/lender is interested primarily in the profit the note is expected to generate, then the instrument is likely to be a security. *Id.* On the other hand, if the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good to

correct for the seller/borrower's cash-flow difficulties, or to advance some other commercial or consumer purpose, the note is not a security. *Id.*

Because of the conflicts in the summary judgment evidence, we are unable to determine the motivation of the seller/borrower, Grotjohn, in making this note. Grotjohn contends that this was a personal loan to correct for short-term cash flow difficulties and was never intended to be a security or vehicle for investment. JEM et al. contend that they viewed the notes as investments in the Spanish project which would bring the project to completion. Although the motivation of the seller/borrower is unclear, it is clear that the motivation of the purchaser/lender was the expectation of a profit, in the form of a high rate of interest. Interest has been deemed by the United States Supreme Court to be a "valuable return on an investment" and sufficient to meet the definition of profit as required by the first factor of the family resemblance test.[4] *Reves*, 494 U.S. at 68 n. 4, 110 S.Ct. 945. A favorable interest rate indicates that profit was the primary goal of the lender. *Id.* at 68, 110 S.Ct. 945.

Because of the state of the evidence in the record, we cannot make a determination as to the conclusion to be drawn from the analysis of this factor.

■ The second factor for analysis is the plan of the distribution of the instrument, i.e., whether it is an instrument in which there is common trading for speculation or investment. The requisite "common trading" is established if the instrument is "offered and sold to a broad segment of the public, . . . ." *Id.* at 68, 110 S.Ct. 945. Again, the summary judgment evidence precludes us from making a determination of whether there was a

plan of distribution for this instrument. Upon its face, the instrument is limited to the parties to the transaction. However, there are no prohibitions on transfers of the instrument to persons who were not original parties to the transaction or prohibitions against trading in a secondary market. In addition, the conversion right included in the instrument does not preclude trading of any stock which may be acquired under that right. In his affidavit, Grotjohn does contend that instruments such as the ones involved in this suit were offered to fewer than thirty-five persons.

■ The third factor is the reasonable expectation of the investing public. The Supreme Court stated that it would "consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Id.* at 66, 110 S.Ct. 945. We take this to mean that even if we find a strong resemblance to the types of instruments described by the Court as nonsecurities, under an analysis of the other three factors of the family resemblance test, an instrument may still be considered a security if expectations surrounding the instrument are such that the general public would consider the instrument a security.

■ The instrument in this case is entitled "PROMISSORY NOTE / CONVERTIBLE DEBENTURE." The conversion feature of this note allowed the lender to convert the principal amount to shares in the Spanish company, PCI, at a price of $0.40 per share. Although an instrument entitled a "promissory note" may not give rise to public expectations

---

4. We recognize that the Amarillo court has held that interest is not profit as contemplated by the family resemblance test. *See Campbell v. C.D. Payne and Geldermann Sec., Inc.*, 894 S.W.2d 411, 418–19 (Tex.App.-Amarillo 1995, writ denied). *Campbell* defines profit as "capital appreciation or participation in earn-

ings." *Id.* at 418. We believe the United States Supreme Court clearly intended for interest to be included in the concept of profit when applying the family resemblance test. *See Reves v. Ernst & Young*, 494 U.S. 56, 68 n. 4, 110 S.Ct. 945, 108 L.Ed.2d 47, 61 n. 4 (1990).

that the instrument is a security, the addition of "convertible debenture" alters the expectations. Debenture is defined generally as "[a] debt secured only by the debtor's earning power, not by a lien on any specific asset." BLACK'S LAW DICTIONARY 408 (7th ed.1999). A convertible debenture is "[a] debenture that the holder may change or convert into some other security, such as stock." *Id.* Court decisions have also held debentures to be securities. *See Kusner v. First Pennsylvania* Corp., 531 F.2d 1234 (3d Cir.1976) (holding that convertible debentures and warrants were securities within meaning of both 15 U.S.C.A. § 77b (West 1997 & Supp.1999) and § 78a et seq. (West 1997 & Supp. 1999)); *United States v. Hill,* 298 F.Supp. 1221 (D.Conn.1969) (convertible note was a security). We find that the instruments in this case are reasonably viewed by the public as investments, and therefore securities.

Finally, the fourth factor is whether there exists another regulatory scheme which significantly reduces the risk of the instrument. *Reves,* 494 U.S. at 67, 110 S.Ct. 945. *Reves* indicates that an alternative regulatory scheme, collateral, and insurance are all capable of reducing the risk to note holders sufficiently to render the protection of securities laws unnecessary. *Id.* at 69, 110 S.Ct. 945. These notes are uncollateralized and uninsured. There is no other regulatory scheme applicable to this instrument to supplant the protections afforded by the securities laws.

Based on the analysis of the instruments in question in this case, we find that the instruments are securities as a matter of law. Although the first two factors are inconclusive, the last two factors clearly demonstrate that the instrument in question is a security and not akin to the types of instruments enumerated by the Court as nonsecurities.

Next, JEM et al. must have conclusively shown that Grotjohn et al. sold or offered to sell the securities in question. In the

partial summary judgment (incorporated into the final judgment), the trial court found that "[t]he Debentures were offered and sold to [JEM et al.] by Grotjohn and Chancey within the meaning of 'offer for sale' and 'sale' under § 4(E) of the Act, . . . ." As used in the Texas Securities Act, the terms "sale" or "offer for sale" or "sell" "shall include every disposition, or attempt to dispose of a security for value." TEX.REV.CIV. STAT. ANN. art. 581–4(E) (Vernon Supp.1999). The term "sell" means "any act by which a sale is made, and the term 'sale' or 'offer for sale' shall include a subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent or salesman, by a circular, letter, or advertisement or otherwise, . . . ." *Id.*

It is undisputed that a meeting took place between Grotjohn, Chancey, Owen Harvey,[5] and Taylor around November 26, 1994. It is also undisputed that on December 7, 1994, Taylor, Hamilton, Adams, and McAlister each invested $25,000.00 with Grotjohn. JEM Financial, Inc. invested $25,000.00 on December 28, 1996. It is undisputed by Grotjohn et al. that the purpose of the November 26, 1994, meeting was to discuss the possible investment of JEM et al. in PCI and/or GPCI. Therefore, JEM et al. conclusively established that Grotjohn et al. offered to sell the securities at the November meeting and that JEM et al. purchased the securities in December.

Next, JEM et al. had to show that the offer or sale of the securities was "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, . . . ." TEX.REV.CIV. STAT. ANN. art. 581–33A(2). In the partial summary judgment (incorporated into the final judgment), the trial court found that "Grotjohn

---

5. Identified in Grotjohn et al.'s brief as being deceased.

and Chancey made statements of 'untruths' and 'omissions' to the Plaintiffs in connection with and in order to induce the sale of the Debentures to the Plaintiffs...." However, on review of the summary judgment evidence, we find there is an issue of fact as to whether Grotjohn and Chancey made statements of "untruths" or "omissions." In the summary judgment evidence from JEM et al., Taylor and Miller assert that Grotjohn and Chancey made the following representations:

PCI and/or GPCI had purchased Precise Connections, Inc., a Texas corporation (PCIT), and such entity was to be an integral part of the Spanish Project;

the key people of PCIT had signed a five-year management contract with PCI and/or GPCI;

only $250,000.00, all but $150,000.00 of which had been raised, in bridge funding was required for PCI and/or GPCI to bring the Spanish Project to completion, and for GPCI to receive the first grants and subsidies, of approximately $13 million, from the Spanish government;

the shares of stock of PCI and/or GPCI had a value of at least $0.40/share on that date;

PCI was a Spanish corporation formed by Grotjohn for the purpose of pursuing the Spanish Project, and its assets and rights to the Spanish Project had or would be transferred to GPCI;

Grotjohn had invested over $850,000.00 of his personal funds in PCI, GPCI, and/or the Spanish Project;

H–R Industries, Inc. has been signed to a ten-year operating agreement to operate the Spanish Project for PCI and/or GPCI; and

the financial representations contained in the milestone chart attached to the offering memorandum showed that PCI and/or GPCI would receive over $9 million, of which $8.75 million would be from the Spanish government, prior to January 1, 1995, with expenditures of only $2 million by that date.

Miller and Taylor then asserted in their affidavits that:

Neither PCI nor GPCI had purchased PCIT;

the key people of PCIT had not signed a five-year management contract with PCI or GPCI;

$250,000.00 in bridge funding was absolutely inadequate for PCI and/or GPCI to complete the Spanish Project, which actually required an investment of over $13 million to complete;

neither GPCI nor PCI had any value on the date of their meeting, in fact, both entities were insolvent on that date and remain so today;

PCI was not a Spanish corporation formed by Grotjohn for the purpose of pursuing the Spanish Project;

Grotjohn had not invested over $850,000.00 of his personal funds in PCI, GPCI, or the Spanish Project;

H–R Industries, Inc. had not signed a ten-year operating agreement for the operation of the Spanish Project;

the milestone chart attached to the offering memorandum contained numerous inaccuracies as to the financial history of GPCI and/or PCI, and GPCI and/or PCI could not have obtained the funding from the Spanish government of the $8.75 million plus shown thereon, without first investing $13 million in the Spanish Project; and

Grotjohn and Chancey raised almost $1 million in connection with the promotion of the Spanish Project, of which substantial sums were expended or paid directly to or for the benefit of Grotjohn, Chancey, and Whitten.

In his affidavit in response to the partial summary judgment motion, Grotjohn stated:

He did not communicate to any of the plaintiffs or to Owen Harvey any of the alleged misrepresentations contained in the alleged offering memorandum attached as Exhibit A to the affidavit of J.W. Taylor, Jr. signed on July 16, 1997.

Specifically, he did not represent to J.W. Taylor, Jr. or any of the other plaintiffs prior to the execution of the promissory notes, attached as Exhibit B to the affidavit of J.W. Taylor, Jr., signed on July 16, 1997, that:

PCI and/or GPCI had purchased Precise Connections, Inc., a Texas corporation (PCIT), and such entity was to be an integral part of the Spanish Project;

the key people of PCIT had signed a five-year management contract with PCI and/or GPCI;

only $250,000.00, all but $150,000.00 of which had been raised, in bridge funding was required for PCI and/or GPCI to bring the Spanish Project to completion and for GPCI to receive the first grants and subsidies, of approximately $13 million, from the Spanish government;

the shares of stock of PCI and/or GPCI had a value of at least $0.40/share on that date;

PCI was a Spanish corporation formed by Grotjohn for the purpose of pursuing the Spanish Project, and its assets and rights to the Spanish Project had been or would be transferred to GPCI;

Grotjohn had invested over $850,-000.00 of his personal funds in PCI, GPCI, and/or the Spanish Project;

H–R Industries, Inc. had been signed to a ten-year operating agreement to operate the Spanish Project for PCI and/or GPCI.

We find that Grotjohn et al. produced controverting summary judgment evidence as to whether misrepresentations were made to JEM et al. Thus, fact issues were raised on the alleged misrepresentations.

Because we find a fact issue as to whether misrepresentations were made in the sale of these securities, we do not determine whether Grotjohn, Chancey, or Whitten were sellers and aiders involved in a scheme to sell the debentures to JEM et al., as provided under Article 581–33 of the Act, nor do we determine if any liability existed under the Act. *See* TEX.REV.CIV. STAT. ANN. art. 581–33 (Vernon Supp. 1999).

The trial court made additional findings in the motion for partial summary judgment which we find are not supported by the summary judgment evidence. First, the trial court found that the debentures were not registered under Article 581–7 of the Act at the time of the sale to the plaintiffs. *See* TEX.REV.CIV. STAT. ANN. art. 581–7 (Vernon Supp.1999). We find no evidence in the summary judgment proof to support this finding. Second, the trial court found that Grotjohn, Chancey, and Whitten were not licensed as dealers, agents, or salesmen under Articles 581–12 or 581–18 of the Act at the time of the sale of the debentures. *See* TEX.REV.CIV. STAT. ANN. arts. 581–12, 581–18 (Vernon Supp. 1999). We find no evidence which speaks to whether any of the three were required to be licensed as dealers, agents, or salesmen, or if they were so required, that they were not so licensed.

The trial court also made additional findings in the partial summary judgment which we conclude were established as a matter or law. The trial court found that GPCI was formally organized on December 19, 1994, and Grotjohn, Chancey, and Whitten were all officers of GPCI. Whitten affirmed these facts in his affidavit.

As for Grotjohn et al.'s contentions, we find that the trial court improperly granted JEM et al.'s motion for partial summary judgment that was later incorporated into the final judgment.

### B. Whitten's Contentions

We now address the points of error raised by Whitten. In his first contention, Whitten claims the trial court erred in granting JEM et al.'s motion for summary judgment against him. Whitten contends that the trial court improperly struck his affidavit filed in support of his own motion for summary judgment. The trial court struck the entire affidavit on the grounds

that it consisted of conclusory testimony, recited subjective beliefs, or consisted of statements of an interested witness. The trial court then went on to sustain specific objections to some of the statements contained in the affidavit. The objections made by JEM et al. to the specific statements often included the same objections made to the entire affidavit, and they also objected to various statements on the grounds that the statements were the opinion of the affiant, contained legal conclusions, were based on hearsay, were an attempt by the affiant to testify as an expert, or were not relevant. All of the objections were sustained.

Upon our review of the affidavit, we find that many of the objections were granted in error. The affidavit does contain factual assertions which are proper to consider in ruling on a motion for summary judgment. We will consider this proper evidence as we review the trial court's decision to overrule Whitten's motion for summary judgment.

 Whitten's motion for summary judgment was essentially based on the assertion that he was not a party to the transaction which formed the basis of JEM et al.'s claims, that he did not control the actions of Grotjohn or Chancey, and that he had no knowledge of the representations made by Grotjohn or Chancey. Whitten contends that JEM et al. failed to controvert his summary judgment proof. He also contends that at the very least, the summary judgment evidence raised a fact issue on these points.

In response to Whitten's motion for summary judgment, JEM et al. filed the affidavit of Miller, which stated that it was represented to him in the November 26, 1994, meeting with Grotjohn and Chancey that Whitten was a director of PCI and/or GPCI, and would also act as general counsel for the company. Miller also testified that Whitten acted on behalf of PCI and/or GPCI in connection with the business and legal matters in Spain, as shown by a March 27, 1995, letter to JEM et al. and others. Also, Miller stated that Whitten was introduced to him and others at numerous meetings as the general counsel and a director of PCI and/or GPCI.

Disregarding all conflicts in the evidence and accepting all reasonable inferences favorable to JEM et al., this evidence sufficiently raises a fact issue as to Whitten's role, if any, in the sale of the securities to the plaintiffs. Further, the evidence also raises fact issues regarding Whitten's status as an aider in connection with the sale of the debentures and as a control person under Article 581–33(F) of the Act. *See* TEX.REV.CIV. STAT. ANN. art. 581–33(F) (Vernon Supp.1999).

 Whitten also contends that the trial court erred in overruling his second motion for summary judgment, which was a no-evidence motion under Rule 166a(i) of the Texas Rules of Civil Procedure. In this motion, Whitten contends there is no evidence of various facts which may support various theories of liability asserted by JEM et al. Rule 166a(i) requires that the parties who move for a no-evidence summary judgment must state that there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. TEX.R. CIV. P. 166a(i). Whitten's motion fails to meet this requirement. The motion fails to state which elements of the plaintiff's claims lack any evidentiary support. The motion essentially amounts to a general no-evidence summary judgment motion which is not permissible under Rule 166a(i). *See* TEX.R. CIV. P. 166a(i) cmt. We find that the trial court did not err in overruling Whitten's second motion for summary judgment.

## C. Counterclaim

We now address whether or not the counterclaim filed by Grotjohn et al. was acted on by the trial court, and then examine the contention regarding the trial court's failure to grant summary judgment

in favor of Grotjohn et al. on the basis of the counterclaim.

Grotjohn et al. contend that the counterclaim filed on March 27, 1997, was improperly ruled on by the trial court when, without specifically ruling on the counterclaim, the trial court entered a final judgment in the case. Grotjohn et al. state that the trial court granted summary judgment in favor of JEM et al. on the counterclaim without a motion for summary judgment or a trial on the merits. After a search of the record, we have found no specific disposition of the counterclaim.

The final judgment recited:

On March 26, 1998, the sole remaining issue in the case, the amount of attorney's fees due to the Plaintiffs, came before the Court for a trial on the merits and, prior to the commencement of the trial, the parties announced [their agreement as to the attorneys' fees].

The final judgment in this case incorporated both the partial summary judgment which had previously been granted in favor of JEM et al. and the agreement as to attorneys' fees due to JEM et al. Notwithstanding the recitation in the final judgment, the record is devoid of any indication that the trial court ever disposed of the counterclaim.

JEM et al. contend that the trial court disposed of all issues in open court at the "trial" on the merits on March 26, 1998, and that counsel for Grotjohn and Whitten advised the trial court that all issues were disposed of at this trial. The excerpt from the hearing on which JEM et al. rely for this proposition is as follows:

MR. HIXSON: Your Honor, my name is John Hixson. I'm representing Frank Whitten. My understanding of the procedural history is the Court has ruled on all issues, including the counterclaim. They have been disposed of with the exception of the attorney's fees at this point.

Am I correct, Your Honor?

THE COURT: Yes, sir.

The trial court also inquired of Hixson:

THE COURT: Do you understand as you have related, all the other issues have been disposed of before this day?

MR. HIXSON: That was—that was the understanding I had received, and I expect that the final judgment will reflect—will reflect that.

MR. HOLMES: Yes, sir, it will.

Upon learning that attorneys' fees were the only issue to be taken up by the court at this proceeding, the attorney for Grotjohn stated:

MR. JACKSON: I thought we were here for a trial.

THE COURT: No, sir.

MR. JACKSON: Evidently, this case has been disposed of without us having any involvement in it.

Mr. Holmes, attorney for JEM et al., asked that the record reflect that "the parties to whom [sic] Mr. Jackson represents have been—all claims remaining in this case have been nonsuited as to those parties." However, the motion for nonsuit, filed the day the above hearing took place, states:

COME NOW Plaintiffs [JEM et al.], and file this Notice of Non-suit as to the issue of the amount of attorney's fees against [Grotjohn et al.] and would show the Court the following:

. . . .

1.1 No adverse a[sic] claims for affirmative relief are before the Court.

. . . .

2.1 Plaintiff hereby give [sic] notice to this Court and to all parties to this suit that it is taking a non-suit as to the only remaining issue before the Court, the amount of attorney's fees the Plaintiffs are entitled to, as to Defendants GPCI, Dale Grotjohn and W.H. Chancey only.

. . . .

2.3 No other issue or claim alleged by the Plaintiffs' [sic] herein shall be or

is affected by the filing of this notice of non-suit.

We find no order specifically disposing of the counterclaim. The statements made at the hearing do not concede that all issues have been disposed of by the trial court.

However, the judgment in this cause contains a "Mother Hubbard" clause which creates a final judgment because it disposes of all parties and issues before the court. We view this final judgment as a final summary judgment because, aside from the agreement as to attorneys' fees, all of the substantive issues were determined by the court's rulings on the various summary judgment motions.[6]

 If a party erroneously affected by a judgment which contains a "Mother Hubbard" clause (1) asks the trial court to correct the erroneous summary judgment while the trial court retains plenary power over its judgment, or (2) perfects a timely appeal, the party preserves the complaint that issues were not disposed of by the judgment containing the "Mother Hubbard" clause. *See Inglish v. Union State Bank*, 945 S.W.2d 810, 811 (Tex.1997). In a motion for new trial, Grotjohn et al. timely asserted the complaint that the usury counterclaim was not disposed of by the trial court in the purportedly final judgment. The motion for new trial was overruled by operation of law, and Grotjohn et al. brought this claim on direct appeal.

Because the counterclaim was not disposed of by the trial court, we sustain this point of error. *See Bandera Elec. Coop., Inc. v. Gilchrist*, 946 S.W.2d 336 (Tex. 1997).

In the last contention, Whitten argues that the trial court erred in denying Grotjohn et al.'s motion for summary judgment on their usury counterclaim. In the

summary judgment motion, Grotjohn et al. argued that there was no genuine issue of material fact that each of the plaintiffs (JEM et al.) entered into a contract which was usurious and demanded payment of interest which was more than the statutorily allowed rate of interest. The trial court denied the motion.

 The threshold question which we must address is whether usury will attach to the transactions in this case. Under Texas law, usury is defined as interest in excess of the amount allowed by law. TEX.REV.CIV. STAT. ANN. art. 5069–1.01(d) (Vernon 1987).[7] The essential elements of a usurious transaction are: (1) a loan of money; (2) an absolute obligation that the principal be repaid; and (3) the exaction from the borrower of a greater compensation than the amount allowed by law for the use of money by the borrower. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982). Where the transaction appears lawful on its face, the party claiming the usury has the burden of proof. *American Century Mortgage Investors v. Regional Ctr., Ltd.*, 529 S.W.2d 578, 583 (Tex.Civ. App.-Dallas 1975, writ ref'd n.r.e.). However, where the instruments show on their face that the loan is usurious, the lender has the burden to prove that the terms of the loan resulted from accidental and bona fide error. *Miller v. First State Bank*, 551 S.W.2d 89, 99 (Tex.Civ.App.-Fort Worth 1977), *modified on other grounds*, 563 S.W.2d 572 (Tex.1978).

 We must first determine whether the transactions involved in this case, which we have already deemed to be securities, may also constitute loans. We believe that an instrument can be both a loan subject to the usury statute and a security

---

6. The trial court stated on the record at the hearing on March 26, 1998, that the hearing was not a trial and, in substance, the hearing's sole purpose seems to have been to get the agreement as to attorneys' fees on the record.

7. Recodified at TEX. FIN.CODE ANN. § 301.001(4) (Vernon 1998).

subject to the Texas Securities Act.[8] *See* Tex.Rev.Civ. Stat. Ann. art. 581–4(A) (Vernon Supp.2000) (statute includes note in definition of security).

When money is advanced to enable one to engage in a business venture with the understanding that the advance and an added amount are to be returned, there is a loan, and the added amount is interest, which may not exceed the statutory maximum, regardless of the form of the transaction. *Johns v. Jaeb,* 518 S.W.2d 857, 859 (Tex.Civ.App.-Dallas 1974, no writ). The transaction in the present case is also a loan.

The instruments also manifest an absolute obligation to repay the amount borrowed, if the option to convert the principal and accrued interest into shares in PCI was not exercised. The option was not exercised, and demand was made by the borrowers on Grotjohn for the principal and interest contracted for in the instrument.

On their face, the instruments charge a usurious rate of interest. A contract is usurious as a matter of law if there is any contingency by which the lender may receive more than the lawful rate of interest. *Dixon v. Brooks,* 678 S.W.2d 728 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.). Interest may not be charged in an amount greater than 18% per annum. *See* Tex.Rev.Civ. Stat. Ann. art. 5069–1.04(2)(b)(1) (Vernon 1987).[9] Regardless of whether the option to convert to stock is utilized, the instrument provides for a contingency whereby JEM et al. could receive an unlawful rate of interest for the use of their money, that is, interest greater than 18%. The instruments provided for 10%

interest per month on the $25,000.00 principal for the initial ninety-day loan period. This results in a 120% annual interest rate. After the first ninety days, the agreement could be renewed for an additional ninety days at a rate of 15% per annum for the renewal period. The total resulting annual interest charged on the face of the instrument is 68%.

Grotjohn stated in his affidavit filed in support of his motion for summary judgment that on June 13, 1995, a demand letter was sent on behalf of JEM et al. demanding a payment of $33,204.00 for each investor to be paid by June 16, 1995, for a total due from Grotjohn of $166,-020.00. The amount demanded constituted $125,000.00 in principal and $41,020.00 in interest. The rate of interest demanded amounted to 61%.

In response to Grotjohn's motion for summary judgment, J.W. Taylor stated in his affidavit that he believed that Grotjohn and/or the other defendants had fraudulently included an interest rate of 10% per month so as to bar any recovery by JEM et al. To substantiate this opinion, Taylor alleges that usury was not raised against any of the other investors aside from the investors-plaintiffs in this suit. He does not provide any additional facts which substantiate his opinion that the terms on the face of the note were an attempt to defraud the investors. The response also contained a copy of a second demand letter, dated June 15, 1995, sent on behalf of JEM et al., which stated that a mistake had been made in the promissory note/convertible debentures regarding the interest rate charged in the initial ninety-day loan period and that the rate, which had been mistakenly stated as 10% per month

---

8. We are aware that a Houston court of appeals has reached a different conclusion in *Cure v. Sussman,* 795 S.W.2d 804, 805 (Tex. App.-Houston [14th Dist.] 1990, writ denied). In that case, the Houston court stated that the appellant "was not entitled to a usury defense in a transaction involving an investment contract," which is also a security. However, *Cure* is distinguishable from the facts in the case at hand. *Cure* involved a profit-sharing

contract requiring an investment and repayment from the profits of the venture. It did not specify that it was a loan or state a rate of interest.

9. Recodified at Tex. Fin.Code Ann. § 303.001 (Vernon Supp.2000), § 303.304 (Vernon 1998).

should be corrected to provide for 10% per annum interest. The total demand for the five investors was reduced to $129,486.00. The actual amount demanded reflected a 7% rate of interest.

Even though the instruments are usurious on their face, we believe the response raises an issue of fact as to whether the usurious rate of interest was the result of a mistake or bona fide error. Therefore, we conclude the trial court did not err in denying Grotjohn et al.'s motion for summary judgment on their counterclaim for usury.

## DISPOSITION

Because of the legal principles set out above and the summary judgment evidence to which we have referred, there are material issues of fact as to whether (1) Grotjohn and Chancey sold the securities by means of false and/or misleading representations of material facts, (2) Grotjohn, Chancey, or Whitten knew or should have known that they were false or misleading, and (3) whether JEM et al. justifiably relied on those representations. Thus, material issues of fact exist as to JEM et al.'s causes of action for violation of the Texas Securities Act. Additionally, issues of fact exist as to what role, if any, Whitten played in the sale of these securities or if he was a control person in GPCI and can be held liable for fraud, if any, found to have been committed by Grotjohn and Chancey. Finally, issues of fact remain regarding Grotjohn et al.'s counterclaim for usury.

The judgment is reversed, and the cause is remanded for trial in accordance with this opinion.