REVISED 10/17/00

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-20514

_____


In The Matter Of:  WESTCAP ENTERPRISES; WESTCAP CORP.,

                                        Debtors.

----------------------------

WESTCAP ENTERPRISES; WESTCAP CORPORATION,

                        Appellants-Cross-Appellees,

                    versus

CITY COLLEGES OF CHICAGO; BOARD OF TRUSTEES,
OF COMMUNITY COLLEGE DISTRICT NO. 508 COUNTY
OF COOK STATE OF ILLINOIS,

                        Appellees-Cross-Appellants.

----------------------------

In The Matter Of:  WESTCAP ENTERPRISES, INC.,

                                        Debtor,

THE WESTCAP CORP.; WESTCAP ENTERPRISES, INC.,

                                        Appellants.

----------------------------

In The Matter Of:  WESTCAP ENTERPRISES, INC.,

                                        Debtor,

WESTCAP CORP.,

                        Appellant-Cross-Appellee,

versus

BOARD OF TRUSTEES OF COMMUNITY COLLEGE
DISTRICT NO. 508 COUNTY OF COOK STATE
OF ILLINOIS,

Appellee-Cross-Appellant.

_____

Appeals from the United States District Court for the
Southern District of Texas
_____

October 13, 2000

Before JOLLY and DeMOSS, Circuit Judges, and DAVID D. DOWD,[*]
District Judge.

E. GRADY JOLLY, Circuit Judge:

City Colleges of Chicago got stung badly in the crash of the
bond market in the fall of 1993--and, in particular, the crash of
the mortgage-backed bond market.  It was indeed a risky investment
for City Colleges.  City Colleges lost about half its entire
portfolio.  City Colleges ultimately sued the seller of the bonds,
Westcap, which had been forced into bankruptcy.  After a bench
trial, the bankruptcy judge entered judgment in favor of City
Colleges against Westcap, and the district court ultimately
affirmed a judgment of more than $51 million.  On appeal, the
question is whether, under Texas securities law, Westcap made
material misrepresentations or omissions relating to interest rate

_____

[*]District Judge of the Northern District of Ohio, sitting by
designation.

2

movements, the high risk of the investment and the suitability of the investment for City Colleges' portfolio. We conclude that the alleged misrepresentations and omissions were not material to the decision of the investor because the record shows that City Colleges fully understood the nature of the market, the risk of the investment, and its proportion of the investment to its portfolio. We therefore reverse and remand for entry of judgment in favor of Westcap.

I

A

City Colleges of Chicago is a not-for-profit entity consisting of seven accredited community colleges in the city of Chicago. The majority of its funding is provided by local property taxes and state grants. A seven-member board of trustees, all appointed by the mayor of Chicago, oversees the operation of the colleges. The Westcap Corporation is a Delaware-based holding company with its principal place of business in Houston, Texas. Westcap Enterprises is a wholly-owned subsidiary of the Westcap Corporation. Westcap Enterprises, along with several other similar wholly-owned subsidiary entities organized as a single operating entity, was in the business of selling financial securities. Principally, these sales involved federal government-agency backed securities made to institutional investors.

Relative to this appeal, Westcap employed two individuals, Craig Leibold and Jeffrey Oetting, who solicited the investment business of City Colleges through its long-term treasurer, Dr. Phillip Luhmann. During 1993, in roughly three periods of time, Dr. Luhmann purchased from Westcap collateralized mortgage obligations ("CMOs"), a particular type of mortgage-backed security ("MBSs"), amounting into the tens of millions of dollars. The first set of purchases, in the spring and summer, proved profitable, with Luhmann selling his purchases quickly after buying.[1] The last block of purchases, from September through November, turned disastrous, and is the only one at issue in this appeal.[2] This last group, with a combined purchase price of approximately $100 million , plummeted by approximately $70 million

---

[1] On March 31, 1993, Dr. Luhmann purchased his first principal-only bond (a "PO") from Westcap. He sold the security twelve days later for a profit. He bought another PO on April 30, 1993, and sold it seven days later, again at a profit. (Finding of Fact ¶ 58.)

Between July 13, 1993 and September 2, 1993, Dr. Luhmann purchased in excess of $100 million in CMOs from Westcap, all of which he sold within weeks of purchase. (¶¶ 59-62.)

[2] Although Dr. Luhmann had purchased tens of millions in CMOs from Westcap prior to September, he had sold these bonds for a profit in every instance prior to September. The September-November purchases are the only transactions resulting in an "injury" to City Colleges. Because the bankruptcy court concluded that by November, Dr. Luhmann should have known better than to continue these purchases, only the September and October purchases are at issue.

in value when interest rates spiked dramatically in the winter of 1993-94. After the market recovered somewhat, City Colleges elected to sell the securities and suffered a loss in excess of $50 million. It is this loss that precipitated City Colleges' lawsuit. That City Colleges suffered severe losses is not in dispute. Nor is there any serious dispute about the volatile nature of the bonds in which Luhmann extensively invested the City Colleges' investment portfolio.

1

Because the volatility of these bonds is at the center of this case, we describe the material characteristics of these financial instruments. The parties presented the testimony of several experts, as well as the testimony of the principal protagonists, as to the nature of these bonds.[3] We note only several salient features. First, the CMOs all involved government agency backing, e.g., Fannie Mae/Freddie Mac/Ginnie Mae, and, thus, for practical

---

[3]The bankruptcy court described these securities at great length. (¶¶ 16-36.) The district court also described these bonds. See also Banca Cremi, S.A. v. Alex, Brown & Sons, Inc., 132 F.3d 1017, 1022-23 (4th Cir. 1997); Frank v. Bear Stearns & Co., 2000 WL 19191, *1, 11 S.W.3d 380 (Tex.App.-Houston [14th dist.], no writ) ("It is undisputed that these securities were extremely volatile and not suitable for less sophisticated investors."). See also id. at *5  n.1 ("In order to make CMOs more attractive to investors, most of the risk for an entire pool of mortgages was concentrated in the lowest class of securities . . . . [T]hese securities were so undesirable that they were known in the trade as 'toxic waste' or 'waste products.'").

purposes, no principal invested was ever at risk. If held for the duration of the bond term, a purchaser is sure to recoup his investment principal. Second, the bonds were sold in tranches, with each tranche carrying a particular payment stream of interest and/or principal over time. Some CMOs were "interest onlys," or "IOs," while others were "principal onlys," or "POs"; the bonds at issue here are the latter, or, to be specific, "support class POs." As stated by the bankruptcy court, "[a] support-class bond is the least stable of the three classes of bond that make up the FNMA 1993-205 and FNMA 1993-237 securities. The support-class tranche receives payments of principal only after all other classes . . . have received their scheduled payments." (FoF ¶ 23.) Third, CMOs are very interest-rate sensitive; specifically, the given yield of a particular tranche is dependent on how quickly homeowners refinance mortgages because of an interest rate change. The particular rate at which refinancings are being done at a given period of time is measured as a "PSA" number or speed; the higher the number, the faster that repayments are occurring and vice versa.[4] Higher PSAs mean quicker repayments of the bonds. If PSA speeds increase over initial estimates, the bonds generate higher yields. This increased yield increases the market value of the bond. The dynamic also works in reverse. Fourth, these yields

_____

[4]"PSA" stands for "Public Securities Association."

6

could vary quite significantly with even small changes in interest rates; for instance, an increase in interest rates of even one-half a percent would decrease the rate of mortgage refinancings, decreasing the PSA number, and thus stretching out over a longer period of time a particular tranche's receipt of principal and/or interest payments, perhaps dramatically, and in turn reducing its yield and market price. Fifth, the volatility of the price of a particular tranche corresponded roughly to its seniority. That is, a more senior tranche, such as an "A" tranche, had a superior entitlement to the cash flow and consequently was less volatile. Conversely, a "G" tranche typically received no payments until all preceding letter tranches had been paid.[5] On the upside, a so-called "support-class PO," the last tranche in a series, might have very significant yields with increased refinancing rates as it received the excess cash flow in months or years well ahead of those projected. The tranches on which City Colleges lost money were all "G" or "H" tranches of two particular bond series, purchased by Dr. Luhmann in eleven separate transactions valued from $708,000 to almost $24.5 million. In total, from September 9

---

[5]Therefore, the impact of even small increases in interest rates creating slowdowns in PSA rates was felt most dramatically by the most junior tranches. Examining one of the bonds at issue, FNMA 1993-205H, Mr. Weiner, one of the plaintiff's experts, stated, "[s]o this bond is really a bet on faster repayments. It's a bet on falling interest rates . . . ."

through November 3, 1993, City Colleges paid $100.78 million for bonds with a face value of $120.7 million.

2

We now turn to background details. As we have said, the individual solely responsible for City Colleges' investment portfolio was Dr. Philip Luhmann, whose doctorate was in education; indeed, his studies focused on school finance. Dr. Luhmann was the long-time treasurer for City Colleges, appointed in 1966. Until this incident, which cost him his job, Dr. Luhmann had received exemplary reviews. His performance had been described as "excellent," and he had been characterized as "cautious to a fault" and "the epitome of financial conservatism." Perhaps based on this reputation, the City Colleges' board of trustees appears to have become complacent in its oversight duties of him and City Colleges' investments.

These oversight failures occurred at a time when Dr. Luhmann was shifting his investment strategy. In 1987, he began investing in MBSs. In 1991, he began to purchase CMOs. This shift was not initiated by Westcap; Dr. Luhmann did not make his first purchases of CMOs from Westcap until the spring of 1993 and he continued to

purchase other CMO products from other brokers during the entire time in which he purchased from Westcap.[6]

We also note the City Colleges' written investment policy, which was furnished to Westcap. That investment policy, on paper, appeared a conservative one.[7] The policy allowed purchases of bonds issued by federal government agencies. Furthermore, under this policy, it was the duty of the Treasurer to "assure that all purchased securities will mature or be redeemable by such time as

---

[6]Indeed, the bankruptcy court concluded that "Dr. Luhmann purchased POs from brokers other than Westcap for six months before he purchased anything from Westcap. His PO purchases during those six months totaled over $50 million." (¶ 135.)

[7]As provided to Westcap by at least April 21, 1993, as part of an audited financial statement, the policy stated:

> City Colleges is authorized to invest in securities which are guaranteed by the full faith and credit of the United States of America as to principal and interest, repurchase agreements, certificates of deposit, commercial paper of certain companies, the Illinois Public Treasurer's Investment Pool and certain other investments as permitted by Chapter 85, Section 901, et seq. of the Illinois Revised Statutes, as amended . . . . City Colleges intends to hold its investments until they mature.

The Investment Policy further provided:

> The Treasurer may invest restricted and unrestricted funds . . . in the following types of securities, provided that such securities shall mature or be redeemable on a date or dates prior to the time when, in the judgment of the Treasurer, the funds so invested will be required for expenditure by the Board.

(FoF, ¶ 99.)

their proceeds are required for reasonably anticipated expenditure purposes."

3

We next consider Dr. Luhmann's interactions with Westcap's salesmen, Leibold and Oetting. Underlying the bankruptcy court's legal conclusions was its finding that Leibold and Oetting sold CMOs to Dr. Luhmann, who knew very little about these securities and lacked the means by which to analyze the brokers' representations. The bankruptcy court found Dr. Luhmann to be financially unsophisticated, at least with respect to the bonds in question. Although his doctorate in education focused on school finance, the bankruptcy court concluded that the degree provided no training in investments. Finally, although City Colleges had provided Dr. Luhmann with a sophisticated financial analytical tool in the form of a "Bloomberg" system, Dr. Luhmann did not know how to use its more sophisticated features. The bankruptcy court did conclude, however, that "[b]y the time Dr. Luhmann made his first purchase from Westcap he had certain generic information available to him about POs. He knew and understood that an increase in mortgage interest rates would have some negative effect on the present value of a PO."

The bankruptcy court also made several findings with respect to Westcap's salesmen's actions and knowledge. The court found

10

that Leibold and Oetting never presented anything in writing to Dr. Luhmann about the characteristics of these CMOs; that they never fully described to Dr. Luhmann the risks of the securities; that they told Dr. Luhmann that he could purchase and probably sell for a profit before actually having to pay his purchase; that they knew Dr. Luhmann was not a buy-and-hold investor; that they represented an interest rate spike as merely a buying opportunity; and that they talked Dr. Luhmann into buying despite the fact that he had voiced his concern that he thought he was buying too much.  The bankruptcy court also concluded that "Leibold and Oetting knew or should have known that the securities being sold to City Colleges between September 9, 1993 and November 3, 1993 comprised all or almost all of City Colleges' entire investment portfolio . . . ."

Moreover, the bankruptcy court found

at September 27-30, 1993 it had to be clear to Leibold, Oetting and Westcap, if not prior thereto, that the magnitude of POs being acquired by City Colleges was far in excess of any rational amount; especially in light of the volatility (in terms of the present or market value), the desire of Dr. Luhmann to sell the POs he had committed City Colleges to acquire and the magnitude of the amount Leibold was convincing Dr. Luhmann to acquire on and after September 30, 1993.

The bankruptcy court also stated:

This Court specifically declines to find that at September 27-30, 1993, Leibold, Oetting or Westcap believed that Dr. [Luhmann] knew what he was doing in being talked out of selling the POs he already had and into acquiring substantially more of them (i.e., up to $100 million in cost).  This Court finds to the contrary.

11

> In this Court's view, it is not credible that Leibold,
> Oetting or Westcap could have believed September 27, 1993
> that Dr. Luhmann was in fact a sophisticated investor
> (with respect to POs) at the time he was talked into
> retaining the POs he had and in acquiring those POs that
> he did acquire between September 30, 1993 and November 3,
> 1993.[8]

Finally, the bankruptcy court concluded:

> Leibold knew by [approximately September 27-30, 1993],
> from his prior dealings with Dr. Luhmann, that he was not

---

[8]We can find no evidence that supports a conclusion that Dr.
Luhmann did not know and understand what he was doing.  Indeed, as
we note later in this opinion, the evidence is to the contrary.
Whether he was appropriately sensitive to the consequences of what
he was doing is another matter.  Any conclusions in this respect,
however, are largely speculative and grounded in post-conduct
evaluation.  We make special note that the testimony of Mark
Salter, Westcap's head trader, does not support the bankruptcy
court's characterization.  Mr. Salter testified that <u>after</u> the
sales on November 1 and 3 he became concerned and "wasn't
comfortable selling him any more PO's. . . . I wasn't comfortable
that this guy knew what he was doing any more." (10/7, pp. 68-69.)
Thus, it was not until <u>after</u> Luhmann's purchases of the POs at
issue in this case that a principal at Westcap came to the
conclusion that Luhmann might not be as sophisticated as he had
once appeared to be.
    We acknowledge that Westcap's compliance officer, Thomas
Anderson, had raised the City Colleges' account in a management
meeting as the "account of the week" in early August of 1993.  (FoF
¶ 93.) This meeting, however, did not question the suitability of
CMOs for City Colleges or the ability of Dr. Luhmann to understand
his investments.  Instead, Anderson's concern focused on whether
the "markups" charged to City Colleges were appropriate in light of
the heavy activity in the account.  There is no evidence that the
commissions charged by Westcap were inappropriate.  Moreover, the
testimony of Mr. Anderson is unequivocal that Westcap had no duty
under government or security dealer association rules to determine
suitability for institutions with substantial portfolios, such as
City Colleges. <u>See</u> testimony of Mark Salter, 10/7, pp. 29, 30, 31.
Moreover, sales of these type of government-backed securities were
exempt from otherwise applicable suitability rules.  <u>Id.</u> (10/3,
vol. I, pp. 58-59.)

> exercising any independent judgment about purchasing these POs and was relying solely on Leibold's recommendations. . . . These circumstances, as well as Dr. Luhmann's obvious trust and confidence in Leibold, which trust and confidence had been created by the circumstances of their prior dealings, had basically seduced Dr. Luhmann. . . . Leibold knew when he told Dr. Luhmann [that he could purchase POs and still sell for a profit before actually having to purchase the securities] that Dr. Luhmann would rely on his advice (or was highly likely to) and that Dr. Luhmann did not have any means to determine what interest rates might do and was not exercising any independent judgment at this point regarding these investments.

The district court affirmed these findings, stating "[w]hat Luhmann did not know was the magnitude of the risk."

In sum, on the findings stated above, the bankruptcy court concluded that Leibold and Oetting knowingly sold Dr. Luhmann securities contrary to City Colleges' investment policy with respect to the type of securities sold, and with respect to the magnitude of purchases. Because the risks were great, and the share of the portfolio was disproportionate, the court determined that these investments were not suitable investments for City Colleges and that omitting to warn City Colleges in this respect was material and caused the damages at issue. Therefore, the sales pitch that a profit could possibly be made from additional purchases, or by holding onto bonds already purchased, was made misleading by the omission by Westcap that the investment was highly dangerous and the size of the investment disproportionate to City Colleges' portfolio--and hence was an unsuitable investment.

13

Specifically, the bankruptcy court concluded that "[b]ut for Leibold's sales tactics at or shortly before September 30, 1993, Dr. Luhmann would have sold out the POs in City Colleges' portfolio that he bought from Westcap and would not have acquired those he bought on and after September 30, 1993. City Colleges' loss would have been $2,000,000 instead of approximately $50,000,000."

4

Finally, because we do not think that the alleged misrepresentations and omissions here, as well as the financial losses, can be understood or analyzed without reference to the market context, we note that it is undisputed in the record that the mortgage-backed securities market experienced a fluctuation of historical proportion in this period. From prepayments in the summer of 1993 "at probably the fastest pace in history,"[9] prepayments became minimal due to a more than a doubling of interest rates in a six-month period. Without contradiction, Westcap's expert characterized these interest rates as "an exceptionally large movement in a short period of time. Movements of this magnitude in interest rates over that short of a period is a very rare and unusual event." (10/9, vol. I, p. 91.) The evidence at trial showed that refinancings as a percentage of all mortgage originations fell from seventy percent of the total

_____

[9](Testimony of Mark Salter, 10/7, p. 49.)

14

originations in October 1993 to approximately ten percent of originations in October 1994.

## II

Now we backtrack a bit to say a word about the procedural history of the case. Sometime after these events we have just related, Westcap sought refuge in bankruptcy. City Colleges filed proofs of claims against Westcap after Westcap filed bankruptcy in April of 1996. These claims were tried before the bankruptcy court in a nine-day bench trial, after which the bankruptcy court found Westcap liable and awarded City Colleges damages. The bankruptcy court entered an extensive memorandum opinion, in which it made lengthy findings of fact and conclusions of law, some of which we have just discussed. Upon appeal, the district court affirmed the determination of liability but reversed and remanded on the method of calculation used to fix City Colleges' damages. Upon remand, the bankruptcy court recalculated damages and awarded City Colleges post-petition interest, a determination subsequently affirmed in whole by the district court. This appeal followed.

## III

We review the bankruptcy court's findings of fact under a "clearly erroneous" standard. See Fed. R. Civ. P. 52(a); In re United States Abatement Corp., 79 F.3d 393, 397-98 (5th Cir. 1996). "If a finding is not supported by substantial evidence, it will be

15

found to be clearly erroneous." WRIGHT & MILLER, 9A FEDERAL PRACTICE & PROCEDURE, § 2585, p. 576 (1995). When the district court has affirmed the bankruptcy court's findings, the review for clear error is strict. See Traina v. Whitney Nat. Bank, 109 F.3d 244, 246 (5th Cir. 1997). We review mixed questions of law and fact, as well as pure questions of law, *de novo*. See Bass v. Denney (In re Bass), 171 F.3d 1016, 1021 (5th Cir. 1999). Whether a statement or omission concerns a material fact is a mixed question of law and fact, and is thus subject to *de novo* review. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976); In re Bass, 171 F.3d at 1021.

IV

The primary issue on appeal is a mixed question of fact and law: whether Westcap's salesmen, Leibold and Oetting, made material misrepresentations or omissions to Dr. Luhmann in the course of selling City Colleges a highly volatile security. We examine the facts here and apply Texas law, as the district court upheld liability here on the basis of the bankruptcy court's finding of a violation of article 581-33 of the Texas Securities

16

Act.[10]   See Tex. Rev. Civ. Stat. art. 581-33(A) (Vernon's Supp. 2000).

V

The Texas act, in relevant part, provides:

> A person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary to make the statement made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying

---

[10]City Colleges brought claims under federal securities law, Texas and Illinois securities law, and Texas common law principles of negligence, fraud, misrepresentation, and deceit.  The bankruptcy court did not apply the Illinois Act, concluding that the Texas Act and the Illinois Act are effectively the same and the result would be the same under either Act as applied.  The bankruptcy court rejected City Colleges' common law claims on the basis that Luhmann's reliance was not legally justifiable under the circumstances.  Likewise, the bankruptcy court rejected City Colleges' claims under federal securities law because City Colleges failed to meet the requirements for reasonable reliance and due diligence required under federal security law, a requirement that does not exist under the Texas statute.  Specifically, the bankruptcy court concluded that Dr. Luhmann knew of some risk and thus was on notice that he should determine the extent of his exposure with respect to these investments.  These rulings have not been appealed and are not before this court.

The bankruptcy court, however, concluded that Westcap was liable under common law principles of negligence, based on an application of Restatement (Second) of Torts § 551(2)(c).  Even if this Restatement section is applicable in Texas, a point of dispute we need not reach, see, e.g., SmithKline Beecham Corp. v. Doe, 903 S.W.2d 347, 352 (Tex. 1995), that provision requires disclosure of facts to another party to a business transaction "if he knows that the other is . . . under a mistake as to them."  For the reasons stated in this opinion, the record does not show that Luhmann was under a mistake as to the "facts basic to the transaction" or that Westcap's representatives knew that Luhmann was mistaken as to these facts.  Therefore, we reject negligence as a basis for liability for essentially the same reasons that we reverse liability based on the Texas Securities Act.

17

the security from him . . . . However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.[11]

The Texas Securities Act does not require that the buyer prove his own due diligence. See Lutheran Bhd. v. Kidder Peabody & Co., 829 S.W.2d 300, 307 (Tex.App.), *judgment set aside on other grounds*, 840 S.W.2d 384 (Tex. 1992). Nor does the Act require a buyer's reliance on the misrepresentations or omissions. See Granader v. McBee, 23 F.3d 120, 123 (5th Cir. 1994). Under Texas law, a statement or omission is material, "if there was an appreciable likelihood that it could have significantly affected the investment decisions of a reasonable investor by substantially altering the information available to him in deciding whether to invest." Beebe v. Compaq Computer Corp., 940 S.W.2d 304, 306 (Tex.App.–Hous. [14th Dist.] 1997, no writ). See also Lutheran Bhd., 829 S.W.2d at 307

---

[11]We note that the Act speaks exclusively to liability for sales of a security. See, e.g., Pitman v. Lightfoot, 937 S.W.2d 496, 531 (Tex. App.–San Antonio 1996) ("[T]he plaintiff must show the untrue statements were made before the sale occurred."); Nicholas v. Crocker, 687 S.W.2d at 368; Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1418 (5th Cir. 1993). Here, the large measure of damages reflected in part a finding that but for Westcap's misrepresentations and omissions, Luhmann would have sold his September purchases in time to avoid major market losses. Westcap argues forcefully that there can be no violation of the Texas statute for Luhmann's decision to retain securities he had already purchased. We need not decide this issue, however, as we reverse on other grounds.

18

("To be material, a misrepresentation or omission must have influenced the buyer's actions to the extent that the buyer would not have entered into the transaction had the representation not been made."). Thus, in considering whether an expression of opinion can be actionable, Texas courts look to the statement's specificity and the relative knowledge of the speaker and the recipient. See Paull v. Capital Resource Management, Inc., 987 S.W.2d 214, 218 (Tex.App.--Austin 1999, pet. denied). Also, "[b]ecause the Texas Securities Act is so similar to the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas Act." Grotjohn Precise Connexiones Int'l v. JEM Fin., Inc., 12 S.W.3d 859, 868 (Tex.App.–Texarkana)(no writ)(citing Searsy v. Commercial Trading Corp., 560 S.W.2d 637 (Tex. 1977)).[12] The United States Supreme Court has defined "material" as follows: "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Birdwell v. State of Texas, 804 S.W.2d 900, 903

_____

[12]See Beebe, 940 S.W.2d at 306 ("While cases dealing with the federal securities laws are not dispositive concerning our interpretation of the Texas Securities Act, they may provide persuasive guidance.").

& n.4 (Tex. Crim. App.)(en banc)("[A]ll of the generally accepted [federal] formulations [of materiality] concentrate on the importance of the misrepresentation or nondisclosure as they relate to the reasonable investor's decision whether to invest or act.")(citing cases from Ninth, Fifth, Second, and Tenth Circuits). Our opinion today also is informed by the following observation of the Texas Supreme Court:

> An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud. In particular, an expression of opinion about monetary value is not a representation of fact which gives rise to an action for fraud. Whether a statement is an actionable statement of "fact" or merely one of "opinion" often depends on the circumstances in which a statement is made. Among the relevant circumstances are the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future.

Transp. Ins. Co. v. Faircloth, 898 S.W.2d 269, 276 (Tex. 1995) (involving common law fraud claim).

VI

We turn now to apply these principles to the facts of this case. We can affirm the conclusion that Westcap is liable to City Colleges if the evidence supports the legal conclusion that Westcap's salesmen made either material misrepresentations or material omissions that caused damage here to City Colleges. We

20

first address the alleged affirmative misrepresentations as a basis for liability.

A

Although City Colleges argues broadly that Leibold and Oetting engaged in affirmative misrepresentations from the beginning of their relationship with Dr. Luhmann, City Colleges and the bankruptcy court focused only on the September-November 1993 time period. This is true because the injury alleged by City Colleges resulted only from these transactions. City Colleges points to a statement by Leibold to Luhmann on or about September 27-30, 1993: Leibold said that Luhmann should not sell the securities Luhmann already held and that he could even buy more and still make a profit. Particularly, City Colleges defines this statement, in the context of other statements made, as a misrepresentation that interest rates would go down and that Luhmann could later sell the securities he held for a profit. Specifically, City Colleges argues: "Westcap was found liable because it, *inter alia*, (i) affirmatively misrepresented that interest rates would go down, and thus that City Colleges could sell the disputed securities for a profit, and (ii) omitted to disclose the degree of risk associated with the POs if interest rates would rise."[13]

---

[13]There is no evidence in the record that in the September transactions, Westcap's salesmen represented to Dr. Luhmann specifically that interest rates would go down. In fact, the

This alleged misrepresentation also relates to the bankruptcy court's findings that Westcap representatives told Dr. Luhmann that he could purchase and sell for a profit before actually having to pay for his purchase; that an interest rate spike was merely a buying opportunity; and that they thus talked Dr. Luhmann into buying despite the fact that he had voiced his concern that he thought he was buying too much.[14]

City Colleges' basic argument admits that the only misrepresentations made here are predicated upon an alleged representation about the movement of interest rates. Leibold's statements may be high-pressure sales tactics, but they do not amount to material misrepresentations. Leibold certainly did not represent that he had special knowledge as to the movement of

_____

bankruptcy court explicitly stated that "[i]t should be pointed out that Liebold, in making his recommendation, did not affirmatively misrepresent present or past facts . . . ." (RE 256.) Interest rates, however, would have to fall in order for City Colleges to make a profit, which was suggested by Westcap's salesmen. Because this prediction, standing alone, cannot form the basis of liability, the bankruptcy court therefore concluded that "the condition of the market and the direction of the market was not open 'equally' to Dr. Luhmann." (RE 256.) As we discuss, that finding has no support in the record. Indeed, as we discuss, the evidence is to the contrary.

[14]Luhmann testified that in September 1993, he told Leibold that he did not want to purchase more securities, that he thought he had bought too much, but that Leibold nevertheless talked him into buying more by pointing out past profits and asking if Luhmann could afford to pass up the possibility of future profits. (11/12, p. 59.)

interest rates.  Indeed, he did not imply it.  But, whatever the case, Luhmann reasonably can be expected to have known that no one can predict such movement with any degree of certainty, and that expressions in this respect are only opinions.[15]  Moreover, Luhmann admitted that Leibold made no promises to him about his ability to profit.[16]  Luhmann's testimony supports only one conclusion:

---

[15]Luhmann's testimony indicated that Leibold's statements about the market were not unique and were not Luhmann's only source of information.  Luhmann testified that he relied on the predictions of another broker, a Mr. Herring from Prudential, for his views on the movement of interest rates.  (11/2, vol. II., pp. 51-52.)  Likewise, the bankruptcy court noted that "[i]n the Fall of 1993, Prudential also gave Dr. Luhmann its opinion that mortgage rates would go down again."  (Opinion, RE 233.)  Thus, the record does not even support that Leibold's views on interest rates were determinative in Luhmann's decisionmaking.

[16]We note the following line of questioning:

Q.  Now, Mr. Leibold when he made comments to you about the likelihood that you could sell these bonds before the settlement date didn't make any promise to you that that would happen, did he?
A.  [Luhmann] No.
Q.  And he didn't make any assurance to you that that would happen did he?
A.  No.
Q.  And he didn't quantify how likely he thought it was, did he?
A.  No.
Q.  And he didn't give you any explanation of why he thought that was likely?
A.  No.
Q.  Did you ask him any questions about what the basis for his belief that you could get out of these before the settlement date at a profit was?
A.  No, it was going on past experience.
Q.  Did you ask him how certain he was that your experience in these bonds would be the same as they

23

Luhmann knew Leibold's expression of opinion or prediction was based on unpredictable interest rate changes, or, in other words, was just a best guess. Thus, the very basis of the alleged misrepresentation is simply a nonactionable opinion upon which no liability can rest. <u>See, e.g.</u>, <u>Krim v. BancTexas Group, Inc.</u>, 989 F.2d 1435, 1446 (5th Cir. 1993); <u>Raab v. General Physics Corp.</u>, 4 F.3d 286, 290 (4th Cir. 1993) ("No reasonable investor would rely [on 'loose prediction[s]' of growth]. . . . '[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws'")(citation omitted.)[17]

_____

<pre>
              were in the past?
    A.    No.
    Q.    You understood, did you not, that market conditions
          would determine whether you could get out of these
          bonds before the settlement date at a profit?
    A.    Yes.
    Q.    And those market conditions included what was going
          to happen with the rate of interest?
    A.    Yes.
    Q.    And it was going to depend somewhat on what
          happened to mortgage payments and how quickly they
          were made.
    A.    Yes.
</pre>

(11/12, vol. I, pp. 79-80.)

[17]Some of the bankruptcy court's conclusions, moreover, seem contrary to any conclusion that representations about the movement of interest rates could serve as a material misrepresentation. For instance, the court stated: "[T]his Court concludes that since Dr. Luhmann was aware that mortgage interest rates might or might not decline in the near term, and that an increase in mortgage interest rates would have a negative impact on the present value of the POs, that he was under a duty to determine the extent of the risk of a potential increase in mortgage interest rates prior to acquiring

24

Therefore, because Luhmann knew that no one could reliably predict the movement of the relevant interest rates, we must conclude that Westcap made no material affirmative misrepresentation to Dr. Luhmann with respect to the sale of these securities.

B

Given this conclusion, liability must rise or fall on the finding of material omissions regarding the high-risk nature of the purchased securities, as well as omissions with respect to the relative size of Luhmann's investment in these securities. The bankruptcy court referred to this omission as one of "suitability," that is, that Westcap's salesmen knew that the risk and size of City Colleges' investment in these securities was not suitable for the size and purpose of the City Colleges' portfolio. Because Leibold and Oetting were fully aware of this "unsuitability," their failure to warn Luhmann of the extraordinarily high risk of

---

these securities." (Opinion, RE 247-48.) A finding that he was aware that mortgage rates might move in either direction undercuts the materiality of any alleged misrepresentation.

Additionally, the bankruptcy court concluded: "Apparently Dr. Luhmann never considered that the downward spiral of mortgage interest rates that City Colleges had benefitted from (in buying POs) during the period November 1992 to September 1, 1993 would come to an end and catch him with an inventory of POs that declined in market value." (Opinion, RE 245.) That statement suggests that the fault here was Luhmann's basic disregard of the plain fact that where a market value increases, it may also fall.

investing too much in these securities was a material omission under Texas securities laws.

As we have earlier noted, under Texas law, an omission is material only if the fact or facts omitted would have substantially altered the information available to the investor relative to his investment decision. See Beebe, 940 S.W.2d at 306; Lutheran Bhd., 829 S.W.2d at 307. It is uncontested that Leibold and Oetting did not specifically discuss the suitability of the September transactions in terms of risk and size relative to City Colleges' portfolio. Thus, we think whether the omission here--the failure to warn of the unsuitability of this investment--was material, turns on whether Leibold and Oetting had special knowledge of the risks of these securities and special knowledge of the size of city Colleges' investment in these securities that Dr. Luhmann did not have, which special knowledge could have affected his decision to purchase.

1

First, and foremost, the record amply demonstrates that Luhmann was aware of the significant risks associated with these securities. Luhmann admitted that in the fall of 1993, the critical period here, he was cognizant of the relationship between interest rate movements, especially increasing interest rates, and

26

his ability to profit through quick purchases and quick sales of these securities.[18]

_____

[18]For instance, Luhmann testified to the following:

Q. You understood, did you not, that market conditions would determine whether you could get out of these bonds before the settlement date at a profit?
A. Yes.
Q. And those market conditions included what was going to happen with the rate of interest?
A. Yes.
Q. And it was going to depend somewhat on what happened to mortgage prepayments and how quickly they were made.
A. Yes.
Q. Now, at the time Mr. Leibold gave you his views about what was likely to happen with the market price you in fact knew that the rate of prepayments of mortgages determined how much and how fast prepayments on PO securities would be made, correct?
A. I believe so.
Q. And you knew that this rate of prepayment affected the yield that you would receive on a security, principal on the security. Is that right?
A. I suppose so.
Q. And you knew that if the prepayment slowed the average length or life of that bond would increase so that the amount that you could receive on the bond would be stretched out in time.
A. Yes.
Q. And that is in fact how yield is determined, correct?
A. Yes.
Q. And you knew, did you not, that if the length of the bond was stretched out so that the yield was very low, the price for the bond would be lower than the price would be if the yield on the bond was very high.
A. That makes sense, yes.
Q. Now, you considered whether you wanted to buy the bonds in light of the fact that you might not make a profit before the settlement date, didn't you?

27

Testimony related to Luhmann's understanding of the PSA/yield

dynamic also supports this conclusion.[19]  Based on this testimony,

_____

A.    I suppose I did.
Q.    And you went ahead and bought them anyway, correct?
A.    Yes.
Q.    And you bought them knowing that there was a possibility that you weren't going to be able to make a profit before the settlement date.
A.    I suppose so.
Q.    In fact, you knew that there was a possibility that you wouldn't be able to make a profit on the bonds ever; you might have to hold them until maturity, correct?
A.    That was my usual assumption, that if I couldn't sell them I would hold them, yes.


    [19]We note the following exchange related to a yield table printed in July of 1993:

Q.    And this yield table indicates that if interest rates went up 100 basis points, the PSA would likely drop to 375 and the yield would drop from slightly over 11 to about three-and-a-half, correct?
A.    That's correct.
. . .
The Court:     . . . So, a 1 percent change in interest rates . . . would produce almost an 8 percent change in the yield.
A.    That's correct, because the length of the security would have been – because the security would have been paid out over a much longer period.
The Court:     Okay. And why is that true? Or what was your understanding about why that would be true?
A.    Because the prepayments would go down and, therefore, it wouldn't be paid off as soon. If the interest rates went up, people wouldn't refinance their mortgages as often, and so the prepayment speeds would go down and the mortgage wouldn't be – the total wouldn't be paid off as quickly.

it is abundantly clear that Luhmann knew the dangerous risks behind these securities.[20]

In addition to his explicit testimony, Luhmann's history of purchases further undercuts the finding that he lacked the awareness of the risks of the securities he was purchasing. It is undisputed that Luhmann began purchasing MBSs in 1987, and CMOs in 1991, several years before his dealings with Westcap in 1993. There is nothing in the record that supports an inference that these purchases were made in ignorance.[21] To be sure, he had traded in approximately $50 million worth of these very same securities with other brokers. These products were as complex as those

---

(11/12, vol. II, pp. 37-38.)

[20]We additionally note Luhmann's testimony that he had access to mortgage rate information on his Bloomberg system (Id. at pp. 39-40). Moreover, when asked if he thought someone else could predict interest rate movements, he replied, "No, but I guess I was relying basically on the brokers to advise me on what was a good thing to do." (Id. at p. 41.)

[21]The bankruptcy court correctly found that "Dr. Luhmann had acquired POs for City Colleges prior to commencing to buy them from Westcap. As a result, through prospectuses and other sources he had detailed information available to him about the characteristics of POs. (RE 242.) Although Westcap did not provide prospectuses to Dr. Luhmann, Dr. Luhmann testified that these documents did not play a role in his decisionmaking. Moreover, the prospectuses that he did have provided explicit warnings about POs. For example, a spring 1993 document, cited by the bankruptcy court, warns that POs are not suitable for all investors, that the yield is sensitive to mortgage repayments, and that "[t]he timing of changes in the rate of prepayments may significantly affect the actual yield to maturity to investors . . . ." (RE 242-43.)

29

securities on which City Colleges lost money. It is undisputed that Luhmann had prospectuses for other CMO securities he had purchased. He had seen and analyzed yield tables from his purchases from other brokers and from Westcap. He possessed a system capable of analyzing these securities, and admitted he knew how to use it sufficiently to appreciate the risk of these securities.[22] These prior purchases and sales, the facts of which were undisputed, imply knowledge about the basic risk characteristics of the purchased securities.[23]

---

[22]

> Q. By this time, Dr. Luhmann, March of 1993, what types of investment analysis had you learned to do with respect to collateralized mortgage obligations on the Bloomberg which you had purchased in the fall of 1992?
>
> A. I had learned how to pull up the yield table and to put in the price of the securities as it was offered and to substitute various PSAs in the table and to see what that would – how those – these things would affect the projected yield and payment windows.

(11/4, vol. I, p. 32.)

[23]Finally, we note that several of the bankruptcy court's findings as to Luhmann's understanding of the risk of these securities, and his determination as to the suitability of these securities for his portfolio, cut across the judgment below. For instance, on the suitability question, the bankruptcy court found that "Dr. Luhmann should have realized that these securities were unsuitable for City Colleges," (RE 227), and that "Dr. Luhmann apparently felt that the disputed POs were suitable for purchase by City Colleges because they offered the potential of a good yield and because he had been successful in selling the previous

Our review of the record also convinces us that there is simply no evidence to suggest that Westcap possessed special knowledge on which to make a suitability determination about the size of the sale of these bonds vis-á-vis City Colleges' portfolio.[24]

(a)

First, it is undisputed that Luhmann refused to disclose the City Colleges' portfolio to Westcap. Indeed, Luhmann admitted that it was not his practice to provide his portfolio to brokers.[25]

---

purchases at a profit at or near the settlement date . . . ." (RE 228.) On the question of Dr. Luhmann's understanding of the risk with these securities, the bankruptcy court stated that "Dr. Luhmann must have understood what a one percent (1%) increase in mortgage interest rates would negatively affect the present value of a PO. Dr. Luhmann did not stop to think about the effect of a one-quarter percent(1/4%) increase in mortgage interest rates." (RE 245.) Moreover, the bankruptcy court found that "Dr. Luhmann knew that Leibold might be wrong about interest rates. Therefore, while he was persuaded and misled, he was not deceived in the sense that he knew Leibold might be wrong. He was deceived into believing that the odds were more in his favor that they were." There is no evidence in the record to support a finding of deception. Therefore, these statements serve only to undermine the legal conclusions of the bankruptcy court.

[24]Although the bankruptcy court found that Leibold and Oetting generally knew the size of the City Colleges' portfolio, our reading of the record indicates that this is not altogether clear.

[25]Although the bankruptcy court did not credit Westcap's testimony, we note that this testimony is consistent with Luhmann's testimony. For instance, Oetting testifed that he asked for City Colleges' portfolio, but Luhmann said that he did not have one

(11/12, p. 15.) Luhmann also admitted that he did not tell Leibold and Oetting, or others, City Colleges' cash flow needs.[26] (11/12, vol. II, p. 11.) Furthermore, there is nothing in the record to suggest that Leibold could have known the extent of purchases from other brokers, i.e., that Luhmann was also purchasing millions of dollars of other CMOs from other brokers.[27] In sum, the evidence does not support a conclusion that a warning from Westcap would have imparted anything that Luhmann did not already know given his long history of transacting in these securities, the scale of his

---

available. (Oetting, 10/4, p. 45.)

[26]Westcap's testimony was consistent in this respect. For instance, Leibold was asked, "[d]id [Luhmann] ever give you any information prior to the conversations you had with him beginning in November of 1993 about any cash flow needs or money needs or payroll issues, anything of that sort?" Leibold replied, "No, he did not." (10/2, vol. II, p. 147.) (See also TR 10/1, vol. II, p. 186, 222; TR 10/2 vol. I, p. 6; 10/2, vol I, pp. 44-46.)

[27]Luhmann gave every indication to Leibold and Oetting of being a sophisticated investor: He had a portfolio measured in the tens of millions; he had traded extensively in the very securities Westcap was selling; and he worked with a substantial number of brokers. Furthermore, he possessed the tools necessary to appreciate the risks involved with his investments. Specifically, he had a $20,000 per year split-screen Bloomberg system. Also, Luhmann did not enter into a relationship with Westcap easily; almost a full year passed from Westcap's first contact with Luhmann and his first purchase. Such initial reticence implies the capacity for independent decision-making. Luhmann's investment pattern--buying and quick selling/profit taking and not holding any one security more than five weeks--also tends to demonstrate sophistication. This appearance of sophistication is relevant because it speaks to whether Westcap knew about the materiality of its omission. See Tex. Rev. Civ. Stat. art. 581-33(A)(2)(b).

prior transactions, his superior knowledge of his own portfolio and cash flow needs, and his demonstrated trading success in these bonds.

(b)

Second, because the district court held Westcap liable to City Colleges for its failing to warn it about the risk of overbuying in proportion to its portfolio, we think it relevant that Luhmann's superiors, who clearly understood the size and purposes of City Colleges's portfolio, were also aware of the Luhmann's investments in these securities.  In other words, not only was Luhmann fully aware of the risks of these securities vis-á-vis City Colleges' portfolio, but so too were those to whom he answered.  Luhmann made quarterly reports to City Colleges' board of trustees, reports that were first reviewed by the board's Committee on Financial and Administrative services.  These reports listed the investments the City Colleges held.[28]  The City Colleges' board of trustees was comprised of individuals with sophisticated legal, accounting, and financial backgrounds capable of analyzing these reports.

Mr. Gidwitz, the chairman of City Colleges' board, admitted that he knew that Luhmann had dramatically varied the size of his

_____

[28]See Fischel testimony, 10/9, vol. I, p. 43, ("[T]he information regarding the amount of City Colleges' investments in mortgage-backed securities of various types in comparison to the total investments made was disclosed to the board . . . .").

33

holdings in government agency MBSs within a period of months, despite the fact that City Colleges' investment policy was one of long-term holding and that these were bonds with twenty to thirty-year maturities.[29] Gidwitz also knew that Luhmann was receiving rates of return double to triple the yields from other government securities, which indicates a high risk.[30] Gidwitz testified that he never informed Luhmann that he thought his actions were not in conformity with City Colleges' investment policy. An outside auditor made no mention that Luhmann's investments were violating City Colleges' investment policy.[31] Consistent with this evidence

---

[29]Indeed, holdings of these securities as reported at one point quadrupled from the last preceding report. As of November 30, 1992, the board knew that Luhmann had invested almost fifty percent, or $53.5 million, of City Colleges' portfolio in MBSs. By March of the next year, this number had fallen to approximately $28 million. Then, in May of 1993, Luhmann reported that he held $73.2 million in MBSs, or seventy-five percent of its total portfolio. Indeed, the investment summary sheet provided to the Finance Committee dated May 31, 1993, shows the following investments: $7.85 million in treasury securities; $12 million in "GNMA Mortgage Backed Securities"; and $73.2 million in "Other Agency Mortgage Backed Securities." See also DX 15.11, "Summary of Investment Reports to CCC Financial and Administrative Services Committee 3/31/90 – 9/30/93," (detailing City Colleges' total investments on given dates, with amounts and percentages held in "other agency" MBSs).

[30]Based on this report, Gidwitz stated that he made a mental note to call Dr. Luhmann because he thought this number was "unusually high and significantly high." Gidwitz never, however, called Luhmann.

[31]See Fischel testimony, 10/9, vol. I, p. 46: "And then, if you look at the financial statement itself, there is a statement by Arthur Anderson that the financial statements referred to, present

34

are Luhmann's statements that he had no discussions with the auditors about the propriety or legality of his investments.

Thus, the evidence fairly shows that City Colleges was well aware of Luhmann's pattern of investment practices as related to these securities. In sum, Luhmann and the City Colleges had in their possession the information necessary to appreciate the risks of the investments he was making. Luhmann, and the board, knew the overall size of City Colleges' portfolio and the percent of that portfolio held in MBSs. Thus, given this superior knowledge on the part of Luhmann and his superiors concerning the risk of these securities in proportion to the size and purpose of City Colleges' portfolio, any omission on the part of Westcap about the risk of and magnitude of purchases made in the fall of 1993 simply could not have been material to investment decisions that were made.[32]

fairly in all material respects, the financial position of the City Colleges, and that everything done is in conformity with generally accepted accounting principals, and significantly, there is no statement about any non-compliance with the investment policy, which is what Arthur Anderson is delegated to investigate pursuant to the policy itself." See also id. at 54-56.

[32]We should make clear that Westcap's lack of supervision may well have contributed to the extent of these sales. As found by the bankruptcy court, Westcap can be faulted for its system of internal checks against aggressive salesmanship. The record, however, equally demonstrates City Colleges' failure to exercise its supervisory duties over Luhmann's investment activities, a failing that contributed to the overbuying of these securities. Each of these facts, however, has limited relevance to this appeal, which turns on whether the alleged misrepresentations and/or omissions were material to the purchasing decisions made by City

In the final analysis, we think, as the record makes clear, that the cause of these tremendous financial losses was not any material misrepresentations or omissions on the part of Westcap, but instead resulted from the missteps of an individual who, perhaps because of lack of supervision or too-good salesmanship, simply lost his way.[33]

VII

In sum, for the reasons we have discussed in some detail, the record in this case shows that Dr. Luhmann knew Westcap had no special knowledge regarding interest rates and no special ability to predict the movement of these rates. The record also shows that the statements that Westcap allegedly omitted would not have

_____

Colleges through Dr. Luhmann.

[33]Luhmann admitted explicitly that his over purchases were a simple case of losing track of what he was doing.

| The Court: | By why 80 million. I mean, out of whatever it was, 110 or whatever, that's the thing that kind of surprises me – |
|---|---|
| [Luhmann]: | Yes, it – |
| The Court: | -- for a conservative investor to put 80 percent into one security, one type of security. |
| [Luhmann]: | Yes, I know it's no reason and it doesn't excuse me for doing it, but at the time I was awfully busy and I really lost track of where we were. I should have kept better track, but I didn't. |

(11/12, vol. II, p. 42.) Therefore, the responsibility must fall on Luhmann.

36

substantially altered the information available to Dr. Luhmann or City Colleges in deciding whether to invest because all the necessary information about the risk of these bonds, and their appropriate place and proportion in City Colleges' portfolio, was known to Dr. Luhmann and/or his superiors. Therefore, because City Colleges' claim under the Texas Securities Act fails the "materiality" requirement, the judgment of the district court is REVERSED and the case is REMANDED for entry of judgment for Westcap.

REVERSED and REMANDED for entry of judgment.